PEOPLE *v.* NEWSOME.

1. CONSPIRACY—COMMON LAW—PENALTY.
   A criminal conspiracy is a common-law offense, and by statute, indictable and punishable by imprisonment in the State prison (CLS 1961, § 750.505).

2. SAME—DEFINITION.
   A criminal conspiracy is defined as a mutual understanding or agreement between two or more persons, expressed or implied, to do or accomplish some criminal or unlawful act or purpose, or to accomplish some lawful act or purpose not in itself criminal but by criminal or unlawful means.

3. SAME—RESULT OF AGREEMENT.
   A conspiracy is constituted by an agreement, being the result of the agreement and not the agreement itself.

4. SAME—AGREEMENT—BURDEN OF PROOF.
   The agreement is the gravamen of the offense of common-law criminal conspiracy and must be proved.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Conspiracy § 2.
[2] 16 Am Jur 2d, Conspiracy § 1.
[3] 16 Am Jur 2d, Conspiracy § 7.
[4, 6] 16 Am Jur 2d, Conspiracy §§ 7, 34.
[5] 16 Am Jur 2d, Conspiracy § 15.
[7] 16 Am Jur 2d, Conspiracy §§ 34–36.
[8] 16 Am Jur 2d, Conspiracy § 10.
[9] 16 Am Jur 2d, Conspiracy § 36.
[10] 16 Am Jur 2d, Conspiracy § 2.
[11, 12] 16 Am Jur 2d, Conspiracy §§ 20–26.
[13,14] 16 Am Jur 2d, Conspiracy §§ 34–36.
[15] 16 Am Jur 2d, Conspiracy §§ 20–25.
[16] 16 Am Jur 2d, Conspiracy § 11.
[17, 18] 16 Am Jur 2d, Conspiracy § 42.
[19] 53 Am Jur, Trial § 646.
[20] 53 Am Jur, Trial § 650.

5. Same—Later Joining Member.
    An individual defendant, charged with participation in a crimi-
    nal conspiracy, need not have been a party to the original
    agreement, and, although joining later, he becomes equally
    liable with the original conspirators.

6. Same—Proof—Agreement in Fact.
    Proof of a formal agreement is unnecessary to support a finding
    of guilt of a criminal conspiracy, and it is sufficient if the
    circumstances, acts, and conduct of the parties are such as to
    show an agreement in fact.

7. Same—Agreement—Evidence.
    Proof of the agreement in a prosecution for criminal conspiracy
    may be established by evidence that the parties steadily pursue
    the same object whether acting separately or together by com-
    mon or different means, but ever leading to the same unlawful
    result.

8. Same—Evidence—Scope—Membership.
    Conviction of an accused of criminal conspiracy does not neces-
    sitate a showing that each accused conspirator know the full
    scope of the conspiracy or participate in carrying out each
    detail, or that he was acquainted with each of his coconspira-
    tors or knew the exact part played by each of them.

9. Same—Evidence.
    A conspiracy may be established by circumstantial evidence or
    by evidence both direct and circumstantial.

10. Same—Common Law—Danger to Public Interest.
    Common-law conspiracy is constituted if the acts contemplated
    are corrupt, dishonest, fraudulent or immoral, and in that
    sense illegal or dangerous to the public interest.

11. Same—Information—Pleading.
    Allegations in the information that various named employees
    at municipal incinerators "did conspire, combine, confederate
    and agree together with each other and with" named indi-
    viduals "to cheat and defraud by divers false pretenses, subtle
    means and devices, and to unlawfully obtain and acquire unto
    themselves large sums of money" of the city "with intent to
    cheat and defraud" the city held, to have properly set forth
    a common-law conspiracy.

12. Same—Common-Law Conspiracy—Accepting Bribes.
    Allegations in information that various employees at municipal
    incinerators "did conspire, confederate and agree together"

to "unlawfully give, offer, or promise to agents, employees or servants of the city * * * commissions, gifts or gratuities and to do acts beneficial to such agents, employees or servants * * * with intent and purpose of influencing the actions of such agents, * * * and that the aforesaid agents * * * did solicit, request and accept for themselves, commissions, gifts, and gratuities * * * to the effect that they would act in a particular manner in relation to their principal's, employer's or master's business" *held*, to have alleged a single conspiracy (CL 1948, § 750.125).

13. SAME—MUNICIPAL INCINERATORS—EVIDENCE.

Evidence presented in prosecution for criminal conspiracy on 2 counts *held*, sufficient to show that all appellants had a part in the conspiracies of which they were convicted whereby their employer, the city, was defrauded of rightful income from operation of 4 municipal incinerators.

14. SAME—CITY INCINERATOR—DEFRAUDING CITY OF INCOME—GRATU-ITIES.

Misconduct of city's employees at city incinerators and private contractors for disposal of rubbish whereby conspiracy to defraud city by cheating at scales or permission to dump trucks without payment of any, or a lesser, fee, and by use of gratuities given the employees resulting in defrauding city of its rightful income *held*, in effect but a single conspiracy, since it was all germane to 1 course of wrongdoing.

15. SAME—CRIMINAL CONSPIRACY.

Misconduct charged in information in a prosecution for criminal conspiracy that is all germane to 1 course of wrongdoing charged but 1 conspiracy punishable as a single conspiracy.

16. SAME—CONCERT OF DESIGN.

Criminal conspiracy implies concert of design and not participation in every detail of execution.

17. SAME—TRIAL—TRANSFERENCE OF GUILT—DISCRETION.

Determination of trial judge to try all of the defendants on conspiracy charge together despite the danger of the jury finding some of the defendants guilty by transference of guilt *held*, proper, as the matter of separate trials for defendants on such charge is within the discretion of the trial court, especially where record is devoid of any motion or request made on behalf of any appellant for separate trial.

18. SAME—MASS TRIALS.

A criminal conspiracy by many persons invites mass trial by their conduct, but such proceedings are exceptional and call for use of every safeguard to individualize each defendant in his relation to the mass.

19. SAME—INSTRUCTIONS—INDIVIDUALIZATION OF DEFENDANT.

Information charging 39 defendants with 2 distinct and joint conspiracies, together with proofs sufficient to sustain verdicts of guilty precludes use of instruction that each defendant be individualized and safeguarded against being found guilty merely by reason of being part of the mass.

20. SAME—INSTRUCTIONS—BRIBERY—TIPS—EVIDENCE.

Trial judge's refusal to charge jury that it could consider evidence that gratuities received as tips for extra service could be used as a defense to the count of conspiracy to accept bribes, *held*, proper, where defendants were charged with an agreement to violate the bribery statute and proof of actual violation of that statute was permissible to prove the agreement, and the bribery statute expressly forbade such instruction (CL 1948, § 750.125).

Appeals from Recorder's Court; Koscinski (Arthur J.), J. Submitted Division 1 March 1, 1966, at Detroit. (Docket Nos. 15, 16, 17.) Decided June 28, 1966. Rehearings denied September 9 and 23, 1966. Leave to appeal denied by Supreme Court December 28, 1966. See 378 Mich 745.

Marselle Newsome, Carl Rickenbach, Turner R. Malone, Jr., Maynard Brown, Anthony Mackay, John Molloy, Glenn Caldwell, James Robertson, Alfred Mann, Robert C. Tryban, George D. Norton, James A. Brown, John Casper, and James A. McCaslin were convicted of conspiracy to cheat and defraud and conspiracy to accept gifts and gratuities. Ernest Wallace, Herman Malone, and Robert J. Ferrell were convicted of the second count only. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Samuel H. Olsen,*

Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Ivan A. Barris,* for Marselle Newsome, Carl Rickenbach, Ernest Wallace, Herman Malone, Turner R. Malone, Jr., Maynard Brown, Robert J. Ferrell, and Anthony Mackay.

*Haig Avedisian,* for John Molloy.

*William L. Colden,* for Glenn Caldwell, James Robertson, Alfred Mann, Robert C. Tryban, George D. Norton, James A. Brown, John Casper and James A. McCaslin.

HOLBROOK, J.    Thirty-nine defendants were charged with 2 counts of conspiracy[1] for the crime of conspiracy to cheat and defraud the city of Detroit,[2] and for conspiracy to offer or receive gifts or gratuities to influence the actions of employees in relation to their employer's business.[3]    The

[1] CLS 1961, § 750.505 (Stat Ann 1954 Rev § 28.773).
[2] Count 1 charged the appellants with other defendants therein named "late of the said city of Detroit, in said county heretofore, to wit, on the 21st day of December, A.D. 1956, and on divers other days and dates up to and including the 10th day of July, A.D. 1962, at the said city of Detroit in the county aforesaid, unlawfully, falsely, deceitfully, and fraudulently did conspire, combine, confederate, and agree together and with each other and with" * * * coconspirators therein named, "and with divers other persons, for the purpose and with the intent to cheat and defraud by divers false pretenses, subtle means and devices, and to unlawfully obtain and acquire unto themselves large sums of money, of the property and money of the city of Detroit, a municipal corporation, with intent to cheat and defraud the said city of Detroit, to the great damage of the said city of Detroit."
[3] CL 1948, § 750.125 (Stat Ann § 28.320).
Count 2 charged the appellants with other defendants therein named "late of the said city of Detroit in said county, heretofore, to wit, on the 21st day of December, A.D. 1956, and on divers other days and dates up to and including the 10th day of July, A.D. 1962, at the said city of Detroit, in the county aforesaid, feloniously did, and unlawfully did conspire, combine, confederate, and agree together and with each other" and with certain coconspirators therein named "and with divers other persons, to unlawfully give, offer, or promise

charges were dismissed as to some; others pleaded guilty; 28 were tried in the recorder's court in the city of Detroit before a jury. Twenty-one were convicted on both counts and seven defendants convicted on count 2, the first count having been dismissed by the court. Seventeen defendants have appealed their convictions and sentences including three[4] of the seven convicted on count 2 only.

Counsel for the defendant and appellants, made a motion for a directed verdict at the conclusion of the people's case claiming the people failed to prove one overall conspiracy; that the court under the circumstances should not have permitted the trial of all defendants together because of the great danger of the jury finding defendants guilty by transfer of guilt; and that at most the people had proven several separate conspiracies.

On this appeal appellants claim that the trial court erred in denying the motion for directed verdict and dismissal. Counsel for appellant John Molloy raises two other questions on this appeal, viz: Under the charges in count 1, did the trial court err as a matter of law in denying defendant's motion to quash said information and motions for directed verdict and dismissal? Did the trial court commit prejudicial error in its charge to the jury as to count 2 of the information, by saying that

---

to agents, employees, or servants of the city of Detroit, a municipal corporation, commissions, gifts or gratuities and to do acts beneficial to such agents, employees, or servants of the said city of Detroit with intent and purpose of influencing the actions of such agents, employees or servants in relation to their principal's, employer's, or master's business, and that the aforesaid agents, employees, and servants of the said city of Detroit, did solicit, request and accept for themselves, commissions, gifts, and gratuities and promises to pay commissions, gifts, and gratuities to themselves and doing of acts beneficial to themselves according to the aforesaid agreement or understanding between themselves and other persons as aforesaid, to the effect that they would act in a particular manner in relation to their principal's, employer's, or master's business."

4 Ernest Wallace, Herman Malone, and Robert J. Ferrell.

it could not consider evidence that gratuities received as tips for extra service to be a defense?

There was no direct testimony showing that all of the conspirators and coconspirators met together at one time agreeing to conspire for the purposes contained in counts 1 and 2 of the information. The people based its case upon evidence of certain facts, with legitimate inferences to be drawn therefrom, together with circumstances surrounding numerous actions by the charged participants, who held a direct relationship to a particular business of the city of Detroit, showing a common purpose to effect the claimed conspiracies.

It was the theory of the people on the trial that the conspirators and coconspirators confederated and agreed together and with each other to cheat and defraud the city of Detroit by agreeing to short-weight the trucks of private haulers and permitting them to dump free, material not falling into the classification of highly combustible matter; and, during the period charged, the conspirators would over-weigh the loads dumped by trucks owned and operated by the city to compensate for the shortage recorded for private haulers, thereby defrauding the city of Detroit of its proper income from private haulers for dumping and disposal of waste material at its incinerators.

It was also the theory of the people that the conspirators and coconspirators conspired, confederated, and agreed together and with each other to pay or accept bribes for the privilege of dumping refuse without paying the true costs due and owing the city, and that various sums of money were paid or collected amongst the various individuals named and not remitted to the city at any time.

Evidence was introduced by the people showing the following facts:

The city of Detroit operated four incinerators for the purpose of burning garbage, rubbish, and combustible material. For the most part the materials burned were those collected by the department of public works, a division of the city of Detroit. Private collectors of rubbish, garbage, and materials were also permitted to dump their loads at these incinerators and to pay a tonnage fee to the city for the right of disposal.

Appellants herein were all employees of the city of Detroit department of public works assigned to duties at the four incinerators owned and operated by the city. Appellants John Casper, James Robertson, George D. Norton, Anthony Mackay, Glenn Caldwell, Robert J. Ferrell, James A. McCaslin, Carl Rickenbach were foremen on different daily working shifts. The other appellants worked under the supervision of the foremen named. Personnel from time to time were transferred from one incinerator to another and changed shifts.

The appellants had control of the operation of the incineration plants including the weigh scales and authority to permit dump trucks owned by private contractors to unload garbage or rubbish at the incinerators for a fixed fee. It was discretionary with the operators to permit certain highly combustible materials to be dumped free of charge. Such materials were desired by the city as a substitute for fuel to help burn the wet material. The private contractors had charge accounts with the city and were billed for payment. The payment due was determined for the particular account by weigh slips forwarded by the incinerator employees to the city accounting office. Payment also could be made at the incinerators by use of valued stamps which could be purchased at the incinerator.

It was shown by various witnesses that private contractors paid appellants and other defendants (employees of the city of Detroit) from $1 to $4 per load or on a flat weekly basis, for dumping their trucks at the incinerators. Instructions were given by the foremen to the other employees how to process the trucks of private haulers by short weighing or allowing them to go through free and to overweigh the city trucks. There was testimony by witnesses that money was paid by private truckers to each of the appellants. This money for the most part was by cash according to slips made out by the conspirators and given to the drivers of the private trucking firms. If a contractor failed to pay, the defendants at all four incinerators would refuse to allow his trucks to dump. The drivers would be told to call their boss and have him call a certain person at the incinerator. The defendants including the appellants had complete charge of the four incinerators for the city and if an incinerator was overloaded or behind schedule they would put out a sign "take no load"; however, the private contractors paying the fee were allowed to dump even on these occasions. As usual they were allowed to dump without charge or with a reduced weigh slip.

The arrangements were the same at all four incinerators and were known by all the conspirator contractors. Maynard Brown, one of the foremen, asked Louis Winkler, one of the private contractors, if he knew what the rates were to come in and Winkler replied, "Yes". It was shown that Winkler had similar arrangements with appellants, Glenn Caldwell, James Brown, Anthony Mackay, Robert J. Ferrell, Turner R. Malone, Jr., and James A. McCaslin. The treatment given to the particular contractors was the same by the conspirators regardless of the shift working or the location of the incinerator.

The rates were uniform as to the contractors. If there was a change in rates the new rates were enforced at each of the four incinerators. Two to three hundred free loads were permitted in payment for sporting goods. The method of payment was usually by check made out to cash and cashed by a driver who turned the money over to a conspirator, or by an envelope delivered by the contractor to the driver and then given by the driver to the scaleman or foreman. On occasion checks were made out to cash and indorsed by conspirator scalemen and cashed at the scales all without receipts. All such payments were never accounted for or paid to the city of Detroit.

Louis Winkler, one of the contractors, testified he paid incinerator operators in cash $7,551 in 1958; $8,668 in 1959; $9,204.28 in 1960; $9,321 in 1961; for a total of $34,744.28; whereas, during the same period of time he paid direct to the city of Detroit upon billings by check, $30,420. Martin Findling, one of the conspirators, testified as to coming to an understanding with various trucking companies accepting money instead of tickets and letting companies dump their trucks without further charge. The money was taken for the benefit of those at the incinerator and the money was divided. He short weighed loads upon orders of a fellow conspirator, George D. Norton, and was told by five other conspirators to increase the weight of city trucks. He further testified that he saw two other conspirators falsify weights of city trucks. He went to business offices of contractors to accept moneys for himself and he distributed such moneys to others and received moneys from others who collected for him.

Conspirator Mann on one occasion told driver Sager he couldn't dump and advised him to call his

boss. Sager did so and saw his boss confer with
Mann and after the conversation he was permitted
to dump. Conspirator James Robertson told Sheats
to send driver Lazorowicz "on his way". Lazorowicz
was told to "have Freddie call me". Drivers when
permitted to dump would receive tickets record-
ing reduced weights or would not receive a charge
ticket at all. Similar incidents involved all of ap-
pellants. The private contractors knew of the ar-
rangements and understanding or were informed of
the same as they came into the business and used
the city incinerators. They all participated in the
arrangement by paying money to appellants and
others and accepting improper and reduced weigh
slips or improperly being allowed to dump their
loads for free.

The appellants claim error by reason of the trial
court's denial of their motion for directed verdicts
of "not guilty" at the conclusion of the people's case.
They assert that the people failed to establish an
overall, embracing conspiracy and that the evidence
tended to establish at least 12 distinct conspiracies.
Counsel for appellant John Molloy further claims
that there was a lack of evidence to show a single
overall agreement encompassing all of the defend-
ants and coconspirators to cheat and defraud the
city of Detroit by the employment of false pretenses
and therefore count 1 must fail.

There is no express statute defining the offense
of conspiracy in the State of Michigan. It is a
common-law offense and authority to indict and pun-
ish the same is contained in CLS 1961, § 750.505
(Stat Ann 1954 Rev § 28.773):

"Any person who shall commit any indictable of-
fense at the common law, for the punishment of
which no provision is expressly made by any statute

of this State, shall be guilty of a felony, punishable by imprisonment in the State prison."

A criminal conspiracy is defined as a mutual understanding or *agreement* between two or more persons, expressed or implied, to do or accomplish some criminal or unlawful act or purpose or to accomplish some lawful act or purpose not in itself criminal but by criminal or unlawful means. *People* v. *Tenerowicz* (1934), 266 Mich 276.

A conspiracy is constituted by an agreement; it is, however, the result of the *agreement* and not the *agreement* itself. *Marino* v. *United States* (CCA 9, 1937), 91 F2d 691 (113 ALR 975). The agreement is the gravamen of the offense and must be proved.

The permitted methods of proving such an agreement in a criminal conspiracy are clearly set forth together with supporting citations in an article appearing in 62 Harvard Law Review (1948–1949), p 276, "The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants" as follows (pp 278, 279):

"Establishing the existence of the agreement obviously involves difficult problems of proof, most of which have been solved by a lenient attitude towards the prosecution. Since the criminal combination is frequently an organization flexible in membership, it has been held unnecessary for the jury to find that the individual defendant was a party to the original agreement. If he joins the conspiracy later, he becomes equally liable with the original conspirators. Even with such an expanded view of participation, the difficulty of obtaining direct proof that defendant has been a party to the agreement is manifest. Persons agreeing to engage in criminal activities do not typically 'go out upon the public highways and proclaim their purpose; their methods are devious, hidden, secret, and clandes-

tine'.[5]  Therefore, the courts have held that proof of a formal agreement is unnecessary to support a finding of guilt, and that it is sufficient if the circumstances, acts, and conduct of the parties are such as to show an agreement in fact.[6]  Such an agreement may be established by evidence that 'the parties steadily pursue the same object, whether acting separately or together by common or different means, but ever leading to the same unlawful result'.[7]  The broad discretion vested in the jury by charges phrased in these accepted terms is extended by the rule that it is unnecessary to show that the defendant knew the full scope of the conspiracy or participated in carrying out each detail. Nor need he be acquainted with each of his alleged coconspirators or know the exact part played by each of them.[8]  Any other view would make conspiracy prosecutions impossible.  Conspirators frequently do not have full knowledge of all ramifications of the combination, particularly where the organization is a complex one.  Indeed, the self-interest of the conspirators would frequently demand that as few as possible have such knowledge."[9]

Also, see *People* v. *Knoll* (1932), 258 Mich 89; *People* v. *Roxborough* (1943), 307 Mich 575; *People* v. *Heidt* (1945), 312 Mich 629; *People* v. *Ormsby*

[5] *Marrash* v. *United States* (CA 2, 1909), 168 F 225, 229.

[6] *Glasser* v. *United States* (1942), 315 US 60 (62 S Ct 457, 86 L ed 680; *Madsen* v. *United States* (CA 10, 1947), 165 F2d 507. Difficulties of proof have led to rules of evidence favorable to the prosecution and to leniency on the part of the courts in allowing the prosecutor a wide field of operation. See, *e.g.*, *People* v. *Harry Fleish*, 321 Mich 443, 459.

[7] *United States* v. *Randall* (CA 7, 1947), 164 F2d 284, 289, certiorari denied (1948), 333 US 856 (68 S Ct 729, 92 L ed 1136); cf. *Lefco* v. *United States* (CA 3, 1934), 74 F2d 66, 68; *People* v. *Cohn* (1934), 358 Ill 326, 332 (193 NE 150, 153); Coleridge, J., summing up in *Regina* v. *Murphy* (1837), 8 C & P 297, 310 (173 Eng Rep 502).

[8] *Blumenthal* v. *United States* (1947), 332 US 539 (68 S Ct 248, 92 L ed 154); *United States* v. *Manton* (CA 2, 1938), 107 F2d 834, certiorari denied (1940), 309 US 664 (60 S Ct 590, 84 L ed 1012); *People* v. *DeLano* (1947), 318 Mich 557, certiorari denied (1948), 334 US 818 (68 S Ct 1082, 92 L ed 1748).

[9] See note 48 Yale LJ (1939), 1447, 1450.

(1945), 310 Mich 291; *People* v. *Robinson* (1943), 306 Mich 167; *United States* v. *Manton* (CCA 2, 1938), 107 F2d 834, certiorari denied 309 US 664 (60 S Ct 590, 84 L ed 1012); 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1224.

A conspiracy may be established by circumstantial evidence or by evidence both direct and circumstantial, *People* v. *Tenerowicz, supra, People* v. *Sobczak* (1955), 344 Mich 465.

In the case of *People* v. *Tenerowicz, supra,* on p 283 it is stated:

"There are many authorities holding that it is enough, in order to constitute a common-law conspiracy, if the acts contemplated are corrupt, dishonest, fraudulent or immoral, and in that sense illegal or dangerous to the public interest. *People* v. *Curran,* 286 Ill 302 (121 NE 637); *Aetna Insurance Co.* v. *Commonwealth,* 106 Ky 864 (51 SW 624, 45 LRA 355); *Fimara* v. *Garner,* 86 Conn 434 (85 A 670); *Commonwealth* v. *Waterman,* 122 Mass 43."

Also, see *People* v. *Clark* (1862), 10 Mich 310; *People* v. *Watson* (1889), 75 Mich 582; *People* v. *Butler* (1897), 111 Mich 483; *People* v. *Bird* (1901), 126 Mich 631; *People* v. *Beath* (1936), 277 Mich 473.

The allegations in count 1 of the information properly set forth a common-law conspiracy.

The conspiracy charged in count 2 was to unlawfully offer or receive gifts or gratuities to influence the actions of the employees of the city of Detroit in relation to their employer's business.

The question is raised by appellants, was the evidence presented in the case sufficient to justify submitting to the jury the two conspiracies charged?

The evidence was sufficient to show that all of the appellants had a part in the conspiracies of which they were convicted; their cooperative ef-

forts were evidence of the knowledge of the *agreement* and without their cooperating together, the conspiracies could not have been successful; their overall purpose and misconduct was a joint action and was effected by controlling the city's four incinerators, permitting them to cheat and defraud the city of Detroit of its rightful income, and by unlawfully obtaining money from the city of Detroit for themselves. This was accomplished by conspiring with the private contractors using the incinerators whereby their trucks were allowed to dump free or were charged a lower fee by short-weighting their loads. In order to even up the short weights, the city-owned trucks were overweighed, thereby misrepresenting the facts to the city. This was accomplished by one course of wrongdoing and encompassed the employees at all the city incinerators.

The conspiracy charged in count 2 likewise was a single conspiracy whereby all the parties offered or received money to influence the actions of employees of the city of Detroit in relation to their employer's business.

The evidence, if believed by the jury, was sufficient to demonstrate that the appellants through their actions joined together to accomplish this criminal purpose, for each one received such moneys and were influenced by such payments in relation to their employer's business. The misconduct was germane to one course of wrongdoing and therefore was one conspiracy.

This Court concludes that the proofs did not establish a multiplicity of conspiracies nor that a fair verdict could not be had with so many defendants when tried together. These conclusions are supported by the clear language used in the case of *People* v. *Ryckman* (1943), 307 Mich 631, wherein Mr. Justice STARR stated on pp 641, 642, 643, as follows:

"Defendants further contend that the case presented by the prosecution shows a multiplicity of conspiracies and 'constitutes an omnibus charge' against them. In *People* v. *Tenerowicz, supra,* we said, p 282:

" 'If the misconduct charged is all germane to one course of wrongdoing there is only one conspiracy. It may be charged and punished as a single conspiracy.'

"In 15 CJS, Conspiracy, § 40, pp 1063, 1064,[10] it is stated:

" 'Previous acquaintance between the conspirators is unnecessary, nor is it necessary that each conspirator should have seen the others, or have knowledge as to who all the members of the conspiracy are. It is not essential that the parties meet or that they confer and formulate their plans, nor that each conspirator have knowledge of the scope of the conspiracy or the means by which the purpose is to be accomplished, nor that any time should have been set for the accomplishment of the design. Neither is it necessary that the plan of a combination shall embrace in detail in its early stages the various means by which it is to be executed, as it is sufficient that there is a general plan to accomplish the result sought by such means as may from time to time be found expedient. Conspiracy implies concert of design and not participation in every detail of execution, and it is not necessary that each conspirator should have taken part in every act, or know the exact part performed or to be performed by the others in the furtherance of the conspiracy.'

"See, also, *People* v. *Garska* (1942), 303 Mich 313; *People* v. *Chambers* (1937), 279 Mich 73; *Marino* v. *United States* (CA 9), 91 F2d 691 (113 ALR 975); *Lefco* v. *United States* (CA 3), 74 F2d 66.

"In the present case there was one basic conspiracy, and its common design and purpose was to obstruct justice. The testimony shows that these

10 See, currently, 15A CJS, Conspiracy, § 40, pp 737–740.—RE-
PORTER.

six defendants actively participated in such common design and purpose. It was not necessary that they know other coconspirators or have knowledge of their activities or of the scope of the conspiracy. We find no merit in their claims that the evidence presented by the prosecution shows a multiplicity of conspiracies and constitutes an omnibus charge."

All defendants assert that it was error for the trial judge under the circumstances to permit the trial of all the defendants together because of the great danger of the jury finding defendants guilty by transference of guilt.

The matter of separate trials for defendants is controlled by statute CL 1948, § 768.5 (Stat Ann 1954 Rev § 28.1028).

"Sec. 5  When 2 or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly in the discretion of the court."

The record is devoid of any motion or request made on behalf of any appellant for separate trial. In *People* v. *Millman* (1943), 306 Mich 182, in a headnote it is stated as follows:

"Whether or not defendant was erroneously denied a separate trial on charge of common-law conspiracy to obstruct justice is not before Supreme Court for review where it does not appear from record that motion for separate trial was made by defendant and the reasons therefor."

Also, see *People* v. *Burczyk* (1944), 308 Mich 194; *People* v. *Cooper* (1950), 326 Mich 514; *People* v. *Heidt, supra; People* v. *O'Hara* (1936), 278 Mich 281; *People* v. *Garska, supra; People* v. *Ryckman, supra.* Appellants refer this Court to the case of *Kotteakos* v. *United States,* 328 US 750 (66 S Ct

1239, 90 L ed 1557), and similar cases[11] as authority
for their position that where several distinct con-
spiracies are proven and there are numerous de-
fendants, that a conviction cannot be sustained upon
a charge of a single conspiracy. Also, see *United
States* v. *Speed* (DC DC 1948), 78 F Supp 366; *Lefko*
v. *United States, supra; Marino* v. *United States,
supra; People* v. *Garska, supra; People* v. *Cham-
bers, supra.* In each of these cases, the lower court's
finding that the individual conspiracies therein
charged were, under the facts presented, proper.

In *Kotteakos,* Mr. Justice RUTLEDGE stated on pp
754, 755 as follows:

"As the circuit court of appeals said, there were
'at least eight, and perhaps more, separate and in-
dependent groups, none of which had any connection
with any other, though all dealt independently with
Brown as their agent'. 151 F2d at 172.[12]  As the
government puts it, the pattern was 'that of separate
spokes meeting at a common center,' though, we
may add, without the rim of the wheel to enclose
the spokes."

Concerning so-called mass trials, in *Kotteakos,
supra,* it is stated on p 773 as follows:

"There are times when of necessity, because of
the nature and scope of the particular federation,
large numbers of persons taking part must be tried
together or perhaps not at all, at any rate as respects
some. When many conspire, they invite mass trial
by their conduct. Even so, the proceedings are
exceptional to our tradition and call for use of every
safeguard to individualize each defendant in his
relation to the mass. Wholly different is it with
those who join together with only a few, though

11 *United States* v. *Central Supply Association* (DC ND Ohio ED
1947), 6 FRD 526; *United States* v. *Goss* (CA 4, 1964), 329 F2d
180; *Canella* v. *United States* (CA 9, 1946), 157 F2d 470; *Brooks*
v. *United States* (CA 5, 1947), 164 F2d 142.
12 *United States* v. *Lekacos* (CA 2, 1945), 151 F2d 170.—REPORTER.

many others may be doing the same and though some of them may line up with more than one group."

It is not claimed by the appellants that the trial judge failed to properly instruct the jury so that each defendant was individualized and safeguarded against being found guilty by reason of being part of the mass.

Our finding that counts 1 and 2 properly charged distinct and joint (as distinguished from several) conspiracies and that the proofs submitted, if believed by the jury, were sufficient to sustain verdicts of guilty, precludes our applying the rule set forth in the *Kotteakos Case* as urged by appellants.

The final assertion of error, raised by appellant Molloy presents the question: "Did the trial court commit prejudicial error in its charge to the jury, as to count 2 of the information, *i.e.,* that it could not consider evidence that gratuities received as tips for extra service to be a defense?"

The trial judge in his charge to the jury said:

"Now members of the jury, there have been certain references during these proceedings likening the practice of giving and receiving gratuities as tips, for extra service, and that  *  *  *  this practice has existed for some time. I charge you that the customary nature of the practice of giving or accepting money to the effect that the agent, servant, or employee shall act in any particular manner in relation to his employer's business is not a defense to the charge as contained in the second count in the information and must not be considered by you in arriving at a verdict."

The second count in the information charged a conspiracy to give and receive bribes contrary to the provision of CL 1948, § 750.125 (Stat Ann § 28.320). This statutory section includes a paragraph which sets forth:

"Evidence shall not be admissible in any proceeding or prosecution under this section to show that a gift or acceptance of any commission, money, property, or other valuable thing as is mentioned in this section is customary in any business, trade or calling, nor shall the customary nature of such transaction be any defense in any such proceeding or prosecution."

The appellant claims that since he was charged with a conspiracy, the defense to the conspiracy charge should not be subject to the limitations contained in the bribery statute. The conspiracy charged defendants with an *agreement* to violate the bribery statute and proof of actual violation of that statute was permissible to prove the *agreement.* The statute forbade the introduction of evidence to show that a gift or acceptance of any money, property, or other valuable thing was customary in any business, "nor shall the customary nature of such transaction be any defense in any such proceeding or prosecution." The people only needed to prove a conspiracy to violate this particular law and the people should not be burdened to prove more.

Actual duties of the appellants (employees) required acceptance of all trucks at the incinerators without discrimination. Yet the record is clear that trucks were turned away if the contractor was behind in his payments. Without bribery money paid, there was no dumping; with bribery money paid, the incinerator gates were always an open sesame, even when the "taking no load" signs were posted.

The instructions of the trial judge were proper. The appellants were accorded a fair trial. Judgments of conviction affirmed.

McGregor, P. J., and Quinn, J., concurred.