PEOPLE *v.* ROSEN

1. EVIDENCE—WEIGHT—CREDIBILITY.
   It is the function of the trier of fact, not an appellate court,
   to determine the credibility and the weight to be given to
   evidence presented in a trial.

2. CONSPIRACY—EVIDENCE—SUFFICIENCY—OVERT ACT.
   It is not necessary that an overt act in pursuit of conspiracy
   be proved to sustain a conviction for conspiracy (CLS 1961,
   § 750.505).

3. CONSPIRACY—EVIDENCE—SUFFICIENCY—ARSON.
   Testimony implicating the defendant in a conspiracy and show-
   ing that he had associated with other parties to the conspiracy
   and had spoken to them and they to him about the conspiracy
   was sufficient, if believed by the jury, to sustain defendant's
   conviction of conspiracy to commit arson; therefore the trial
   judge was not clearly in error in refusing defendant's motion
   for a directed verdict of acquittal (CL 1948, § 750.73, CLS
   1961, § 750.505).

Appeal from Washtenaw, William F. Ager, Jr., J.
Submitted Division 2 April 15, 1969, at Lansing.
(Docket No. 5,093.)    Decided July 30, 1969.    Re-
hearing denied September 4, 1969.    Application for
leave to appeal filed September 25, 1969.

Philip Rosen was convicted of conspiracy to com-
mit arson of real property.    Defendant appeals.
Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 30 Am Jur 2d, Evidence §§ 1080–1086, 1164.
[2] 16 Am Jur 2d, Conspiracy §§ 11, 34, 35.
[3] 16 Am Jur 2d, Conspiracy § 34 *et seq.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Karl V. Fink,* Assistant Prosecuting Attorney, for the people.

*Hyman, Gurwin, Nachman & Friedman* (*Lawrence Halpern,* of counsel), for defendant on appeal.

Before: McGregor, P. J., and R. B. Burns and Danhof, JJ.

Danhof, J. Philip Rosen, Seymour Fryman, Bobby Ray Lewis, and Frank Winton were arrested in July, 1965 and charged with conspiracy to commit arson of real property.* At the conclusion of the preliminary examination, Winton was discharged for lack of sufficient evidence. The remaining three defendants were bound over for trial, were convicted by a jury, and each was sentenced to five years on probation and a fine of $100 plus costs.

Rosen has appealed, raising five claims of error. His main contention is that there was insufficient evidence against him at the trial to sustain a conviction of conspiracy to commit arson.

The only evidence connecting Rosen with the conspiracy was the testimony of Orville Rolston and Benjamin Wagner, former employees of the RFC Builders Service Company, of which Rosen was president. At the time of the trial, Rolston had moved from this State and was not available to testify. The trial judge allowed his testimony at the preliminary examination to be read at the trial. This testimony as it relates to the appeal was:

---

* Arson of real property: CL 1948, § 750.73 (Stat Ann 1962 Rev § 28.268); conspiracy: CLS 1961, § 750.505 (Stat Ann 1954 Rev § 28.773).

"*Q.* Directing your attention to July the 2nd, 1965, did you have an occasion to be in Marge's Grill on that date?

"*A.* Yes, I did.

"*Q.* Who else was with you?

"*A.* Mr. Ben Wagner. I returned to RFC Builders Service office and Mr. Ben Wagner was waiting there, whom I knew, and he asked if I wanted to go for a cup of coffee next door; we went next door and Fryman and Rosen were sitting at a booth in Marge's Grill.

"*Q.* Would you relate what occurred in that booth?

"*A.* I sat down beside Fryman and Wagner sat directly across from me beside Rosen. Fryman at this time asked me if I was going to do that job and I laughed at him.

"*Q.* Then what occurred?

"*A.* He looked at Wagner and asked him if he wanted to make a couple hundred bucks real quick, and Wagner asked him doing what; there was no reply. Rosen removed a penny book of matches from his pocket, tore out a match, he had his pen in his hand it appeared as though—the match was on the table. It appeared as though he was writing; the end of the pen was moving but I could not see what was being written or what he was writing on.

"He passed the match to Wagner and he said, 'We supply the material.' Then immediately he looked— Rosen looked at Fryman and said, 'You'll never get away with that, I wouldn't do that; I was reading about a piece like that in the paper, he got caught.'

\*  \*  \*  \*  \*  \*  \*  \*  \*

"*Q. (By Mr. Bishop, continuing):* Do you recall anything else that was said at this time?

"*A.* There was a reference made to the house, but I can't give the exact words.

"*Q.* Do you know who made that reference?

"*A.* They were made by Fryman.

"*Q.* Was anything said by anybody after Rosen said something about getting caught if they did this or 'I wouldn't do this because I would get caught?'

"*Mr. DeVine:* Now, this is about as leading a question as I have ever heard.

"*Mr. Bishop:* I am just making reference to the testimony and asking whether anything was said at that time.

"*Mr. Feldstein:* That question has been answered. It's been asked and answered, your Honor.

"*Mr. Baskin:* He has answered that he doesn't recall anything further.

"*The Court:* You may answer the question. Do you understand the question?

"*The Witness:* I would like that repeated, sir.

"*The Court:* Repeat the question.

"*Q. (By Mr. Bishop, continuing):* At the time that Rosen—after pulling the match out said, 'I wouldn't do this. I was reading about a piece in the paper the other day where the people got caught,' did anybody make any comment as to that that you recall now?

"*A.* Rosen said to Wagner, 'We supply the material,' and he passed him the match; I saw the match go to Wagner.

"*Q.* But after that?

"*A.* I can't recall that, sir."

Wagner testified at the trial relative to Rosen:

"*Q. (By Mr. Creal):* Did you ever have occasion to be in Marge's Grill with Orville Rolston?

"*A.* Yes, I have.

"*Q.* And can you place it as close as possible to a date?

"*A.* This far away from that date, I can't, to be honest.

"*Q.* Do you remember what month it would have been in?

"*A.* It would have been in June or July.

"*Q.* June or July, this is 1965?

"*A.* Yes.

"*Q.* And was this on one of your visits to the—

"*A.* Yes.

"*Q.* Did you go to Marge's Grill yourself?

"*A.* No, I went with usually one of the people from the office, was usually with Orville.

"*Q.* Orville Rolston?

"*A.* Yes.

"*Q.* Do you remember an occasion meeting Philip Rosen and Seymour Fryman?

"*A.* Yes, we met them one day around noontime when we were over there. I was waiting for them. They come to the office and we went immediately over there for dinner, and Orville and I followed after a few minutes.

"*Q.* You say you followed after a few minutes?

"*A.* Yes.

"*Q.* Did you sit with them then?

"*A.* Yes.

"*Q.* And did a conversation take place at this time between you and the defendants, Rosen and Fryman?

"*A.* Well, it started between Orville and the defendants.

"*Q.* Started between Orville and them?

"*A.* Yes.

"*Q.* What was said at this time?

"*A.* Well, Fryman asked Orville if he was going to do this job for him, when he was going to do this job, and Orville just smirked it off like.

"*Q.* Like what?

"*A.* Like—(*indicating*).

"*Q.* Did Orville say anything at this time?

"*A.* He did, but exactly, I can't recall.

"*Q.* And then what took place?

"*A.* Well, then I asked him what kind of a job and how much and then Rosen took a match out of a book and wrote the words, the letters, 'use.'

"*Q.* What did he do with this?

"*A.* Well, I took it and put it and threw it in an ashtray. He had it over in front of him.

"*Q.* He took a match out of a match book?

"*A.* Yes.

"*Q.* You say he wrote the word 'use'?

"*A.* Yes.

"*Q.* And he handed it to you?

"*A.* Um-hum.

"*Q.* What did you say to him at this time?

"*A.* I didn't say a thing.

"*Q.* To the best of your recollection, was anything else said at this time?

"*A.* No.    We proceeded to leave and go back to the office."

\*    \*    \*    \*    \*    \*    \*    \*    \*

*Cross-examination*

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* Now, at this meeting, at this conversation in Marge's Grill, I believe you testified at the examination that this took place on July 2nd, is that correct?

"*A.* It could have been.

"*Q.* Was any job referred to, any specific building or anything else referred to at Marge's Grill?

"*A.* No, but the way this sounded to me, was like they were talking about another house.

"*Q.* Another house?

"*A.* Yes.    A different house, in a different locality.

"*Q.* From the one involved in this case?

"*A.* Yes.

"*Q.* And did you take the whole thing as a joke at the time?

"*A.* I didn't take it too serious.

"*Q.* Did you take it as a joke?

"*A.* More or less, yes.

"*Q.* You stated at the examination you just considered the whole thing a joke from just the way the whole thing was conducted.

"*A.* Well, we've always joked around like that.

"*Q.* You mean when there was a house that was in bad shape you just joked about burning it?

"*A.* Well, no—,

"*Q.* Or getting rid of it?

"*A.* Not necessarily a house, just the way the general conversation, we would joke about different things like that.

"*Q.* Is this the way it went on after you went back to the shop and was talking with Mr. Lewis and the other men in the shop?

"*A.* Yes.

"*Mr. Stein:* I have no more questions.

"*The Court?* Anything further, Mr. Creal?"

### Redirect Examination

"*By Mr. Creal:*

"*Q.* Mr. Wagner, you say you didn't take it too seriously; was anybody smiling at this time or laughing when they handed you a match?

"*A.* Yeah, a little bit. I would say smiling.

"*Q.* Who was doing this?

"*A.* Mr. Rosen and myself.

"*Mr. Creal:* I have no further questions."

After the prosecution finished presenting its case, defense counsel made two motions for directed verdicts, one on behalf of Rosen and the other on behalf of Fryman and Lewis. The able trial judge replied in part:

"Now, regarding the testimony as to defendant Rosen. There is no question that there is less testimony concerning any conversation with this defendant. There is no question that the only—the testimony was regarding Rosen's presence in a conversation in one Marge's Grill, and the thing that Rosen is claimed to have said was that, 'We supply the material.' This was at a meeting between Fryman, Mr. Fryman, Mr. Wagner—or a conversation between Mr. Fryman, Mr. Wagner, Mr. Rosen, and the witness. Then there is certain testimony as to Mr. Rosen writing something down on a match. There is certain slight difference between some of

the testimony as to just what was said at the table, what was done at the table. There was some question as to whether anything said at this time or some other time was said in jest or not, some question as to whether or not Mr. Rosen said, 'We supply the material' before or after the comment was made as to, he wouldn't do this.

"The court, taking the testimony as a whole, in other words, all of the testimony that was presented, states that there is sufficient evidence, sufficient testimony before the court that the matter should go to the jury. Now, this is not a charge of arson. The court doesn't find that there is any proof of arson, but this isn't the charge in this case. This is the charge of an agreement made between certain persons to commit arson. Whether or not there was any arson committed or anything done toward the commission of the act, this is immaterial. This is not a charge of attempt. It would be different if there was an attempt, then there must be something done towards the commission of the act. We don't have it in this situation. Conspiracy, we might say, is unique in that it calls for no positive action towards the commission of a criminal act. It is the agreement to commit a criminal act that is prohibited. So the motion is denied."

The defendant has contended that the conversation at Marge's Grill was a joke and, in the alternative, that it shows that he had abandoned any participation in the conspiracy. While these are plausible arguments, it is the function of the trier of fact, not an appellate court, to determine credibility and the weight to be given the evidence presented, *People* v. *Moss* (1969), 16 Mich App 295.

Defendant states in his brief that there must be an overt act in pursuit of the conspiracy, citing *People* v. *Sobczak* (1955), 344 Mich 465. We do not so construe that case. It is true that the Michigan Supreme Court reversed the conviction of conspir-

acy to violate the statutes against gambling and discharged Sobczak because of insufficient proofs adduced to sustain a verdict of conviction, and in so doing noted that there was no evidence of overt acts on his part. However, the absence of such acts was only one of the facts considered. The court opined (pages 469, 470):

"What all of this testimony comes down to is that the defendant was keeping bad company. There is, at least, a breath of suspicion that he was involved somehow in this nefarious business. But it is no more than a suspicion. There may have been valid reasons for the associations described. The names of the defendants have a national similarity. There is evidence of one apparently legitimate business transaction (concerning the Packard street lot) which was the subject of some dealings between defendants and Kuzera.

"It has long been established, of course, that conspiracy may be proved by circumstantial evidence, in fact that such is generally the case. *People* v. *Beller* (1940), 294 Mich 464; *People* v. *Pitcher* (1867), 15 Mich 397. But the circumstances must be such as to warrant a fair inference of the facts to be established. The meetings of defendant with Kuzera are as consistent with innocence as with guilt and it is never to be forgotten that a presumption of innocence cloaks our citizens from birth to death. What we fail to find in this record is any proof that any of the other parties to this conspiracy ever so much as spoke of it to defendant, or he of it to them, or to anyone else, or even that he knew of it. We find none of the other codefendants at the trial implicating this defendant in any way, a circumstance of some significance in view of the fact that the State called as witnesses numerous witnesses who had participated in varying degrees in the operation, but who had not been named in the information as defendants. None of these witnesses

implicated this defendant, although their testimony tended to involve several defendants other than appellant Sobczak. Nor do we find overt acts on his part. What we have is association at certain times over a period of a year with evil men. That is not enough. Criminal guilt under our law is personal fault. It is highly individualistic. It comes not from association, without more, be it with family or friends."

The instant case is distinguishable from the *Sobczak Case, supra,* because here there was testimony implicating Rosen and showing that parties to the conspiracy spoke to him about it and he to them.

As stated in 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1226, p 1619:

"The gist of the offense is the unlawful conspiracy, and it is not necessary that any overt act should have been done in pursuance of such combination. Proof of an overt act may be important for the bearing it may have on the evidence of the conspiracy, and also as it may aid the court in justly grading the punishment upon conviction, but it is not an essential element of the offense."

This Court said in *People v. Newsome* (1966), 3 Mich App 541, 552, 553:

"The agreement is the gravamen of the offense and must be proved.

"The permitted methods of proving such an agreement in a criminal conspiracy are clearly set forth together with supporting citations in an article appearing in 62 Harvard Law Review (1948–1949), p 276, 'The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants' as follows (pp 278, 279):

"'Establishing the existence of the agreement obviously involves difficult problems of proof, most of which have been solved by a lenient attitude towards

the prosecution. Since the criminal combination is frequently an organization flexible in membership, it has been held unnecessary for the jury to find that the individual defendant was a party to the original agreement. If he joins the conspiracy later, he becomes equally liable with the original conspirators. Even with such an expanded view of participation, the difficulty of obtaining direct proof that defendant has been a party to the agreement is manifest. Persons agreeing to engage in criminal activities do not typically "go out upon the public highways and proclaim their purpose; their methods are devious, hidden, secret, and clandestine". Therefore, the courts have held that proof of a formal agreement is unnecessary to support a finding of guilt, and that it is sufficient if the circumstances, acts, and conduct of the parties are such as to show an agreement in fact. Such an agreement may be established by evidence that "the parties steadily pursue the same object, whether acting separately or together by common or different means, but ever leading to the same unlawful result." The broad discretion vested in the jury by charges phrased in these accepted terms is extended by the rule that it is unnecessary to show that the defendant knew the full scope of the conspiracy or participated in carrying out each detail. Nor need he be acquainted with each of his alleged coconspirators or know the exact part played by each of them. Any other view would make conspiracy prosecutions impossible. Conspirators frequently do not have full knowledge of all ramifications of the combination, particularly where the organization is a complex one. Indeed, the self-interest of the conspirators would frequently demand that as few as possible have such knowledge.' "

We hold that there was sufficient testimony to allow the case to go to the jury and that the trial judge was not clearly in error in refusing the defendant's motion for a directed verdict. This testi-

mony, if believed by the jury, was sufficient to sustain his conviction of conspiracy to commit arson.

The remaining claims of error are without merit and do not require discussion.

Affirmed.

All concurred.