PEOPLE *v.* CARTER

PEOPLE *v.* BROYLES

PEOPLE *v.* McCULLY

OPINION OF THE COURT

1. SEARCHES AND SEIZURES—WITHOUT WARRANT—HOT PURSUIT—
EVIDENCE—ADMISSIBILITY.

Evidence discovered by the police in a search and seizure without
a warrant is admissible against a defendant where the search
and seizure were conducted by the police while in hot pursuit
of persons suspected of the crime for which the defendant
was tried and where the evidence was in the plain view of the
police.

2. SEARCHES AND SEIZURES—WITHOUT WARRANT—HOT PURSUIT.

Search without a warrant of an apartment of one of the defend-
ants and seizure of evidence linking the defendants to the
murder charged were not violative of constitutional require-
ments where the evidence was in the plain view of police
officers, who had followed footprints, made in snow, from the
place the victim's body was found to the complex in which
the defendant's apartment was located and then had proceeded
to the doorway of the defendant's apartment, where they
noticed a spot made from someone's standing there with wet
shoes.

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 18–21] 47 Am Jur, Search and Seizure § 16.
[4, 25, 26] 5 Am Jur 2d, Appeal and Error § 806.
[5] 5 Am Jur 2d, Appeal and Error § 778.
[6–8, 22–24] 47 Am Jur, Search and Seizure § 18.
[9, 10] 53 Am Jur, Trial § 56 *et seq.*
[11, 27] 40 Am Jur 2d, Homicide § 313.
[12] 53 Am Jur, Trial § 538.
[13–15] 21 Am Jur 2d, Criminal Law § 331.
[16] 47 Am Jur, Search and Seizure § 52 *et seq.*
[17] 47 Am Jur, Search and Seizure § 19.
[28] 21 Am Jur 2d, Criminal Law § 356.

3. SEARCHES AND SEIZURES—WITHOUT WARRANT—HOT PURSUIT—
EXIGENCIES OF SITUATION.

Evidence discovered by a search without a warrant of the
defendant's apartment was inadmissible where the defendant
was not at home at the time of the searches, the police officers
who had entered the apartment in hot pursuit of persons
suspected of the crime with which the defendant was charged
had determined that the suspects were not there, and, by the
time of the search, the building had been surrounded by the
police, because the exigencies of the situation were not such
as to make the warrant requirement unreasonable nor to make
the search without a warrant imperative.

4. EVIDENCE—HARMLESS ERROR—CUMULATIVE EVIDENCE.

Admission of a .22 caliber revolver and $1,740 in stolen bank
bills into defendants' trial for murdering the owner of a car,
which they later used in a bank robbery, was harmless error,
even though the evidence had been obtained by an illegal
search and seizure, where there was other evidence consisting
of a .25 caliber pistol, .22 caliber ammunition, $2,443 stolen
from the bank, a sweatshirt of the size and color worn by
the bank robber, and paint-covered shoes, relevant since the
place of the murder was spattered with paint, because the
improperly admitted evidence was cumulative in nature.

5. EVIDENCE—HARMLESS ERROR—STANDARD.

The admission of improperly seized evidence is harmless error
only if there is a finding beyond a reasonable doubt that the
evidence did not contribute to the defendant's conviction.

6. SEARCHES AND SEIZURES—AUTOMOBILES—WITHOUT WARRANT—
AFTER ARREST.

A search of an automobile without a warrant, made sometime
after the arrest while the car was in police custody, is legally
made, provided that there was probable cause to have believed
that the car contained articles that the officers were entitled
to seize; probable cause must have existed at the time the
car was originally stopped or seized.

7. SEARCHES AND SEIZURES—AUTOMOBILES—WITHOUT WARRANT—
AFTER ARREST.

A search of an automobile without a warrant, based on probable
cause and made while the car is in police custody, must be
made within a reasonable time after the arrest of the owner
or occupant of the vehicle as the circumstances permit; other-
wise a warrant must be obtained.

8. SEARCHES AND SEIZURES—AUTOMOBILES—WITHOUT WARRANT—POLICE CUSTODY—REASONABLE TIME.

A search without warrant of the defendant's automobile while the car was in police custody was unreasonable even though the police had probable cause to search the automobile at the time it was originally seized where the search was not made until three days after the car had been seized.

9. CRIMINAL LAW—TRIALS—SEPARATE TRIALS—DISCRETION.

The granting of separate trials for criminal defendants is in the discretion of the trial judge (MCLA § 768.5).

10. CRIMINAL LAW—TRIALS—SEPARATE TRIALS—DISCRETION.

Denial of motions for separate trials is not an abuse of discretion where the defendants are charged with the same crime and the same evidence is to be used to implicate all the defendants in the joint commission of the crime.

11. HOMICIDE — MURDER — EVIDENCE —MURDER WEAPON — STOLEN WEAPON — RELEVANCY.

Allowing testimony that a gun, introduced into evidence in defendants' trial for murder and kidnapping and found in an apartment of one of the defendants, had been stolen was error because the testimony was irrelevant to the crimes charged; however, the error was not reversible error where the testimony did not show that the defendants had been imprisoned for other criminal activity or that other crimes had been committed by the defendants and where the reviewing court concluded that the verdicts would not have been different even if the testimony had been excluded.

12. TRIAL—INSTRUCTIONS TO JURY—IDENTIFYING REQUESTING PARTY.

Identifying a portion of the charge as having been requested by the defendants was not prejudicial to the defendants where the error occurred in the midst of instructions encompassing 33 pages and where the instructions properly informed the jury as to the applicable law.

13. CRIMINAL LAW—EXCULPATORY STATEMENTS—FAILURE TO DISCLOSE—EVIDENTIARY HEARINGS

Failure of the prosecutor to disclose to the defendant a statement made by a codefendant and possibly exculpating the defendant demanded remanding for an evidentiary hearing to determine whether the statement was essential to a proper preparation of the defendant's defense, even though the prosecutor had, in good faith, given the statement to the counsel of one of the defendant's codefendants, but the defendant did not receive the statement until after the trial had begun.

14. Criminal Law—Evidence—Exculpatory Disclosure—Good Faith.

Suppression by the prosecutor of evidence favorable to a defendant once the defendant has requested the evidence is violative of due process where the evidence is material to the guilt or punishment of the defendant; the good faith or bad faith of the prosecutor in suppression of the evidence is irrelevant.

15. Criminal Law—Exculpatory Statements—Disclosure—Evidentiary Hearing.

An evidentiary hearing must be held to determine whether the prosecutor's failure to disclose a statement made by a codefendant of the defendant and possible exculpating the defendant was essential to a proper preparation of the defendant's defense; if the hearing shows that the defendant was prejudiced by the lack of the statement, a new trial must be held; however, if the defendant was not prejudiced, his conviction is affirmed.

## Dissent by Bronson, J.

16. Searches and Seizures—Without Warrant—Constitutional Law.

*A search without a warrant is not necessarily violative of the Fourth Amendment; in certain situations the warrant requirement itself is unreasonable (US Const, Am 4).*

17. Searches and Seizures—Incident to Arrest.

*A search is not incident to an arrest where the search is not substantially contemporaneous with the arrest nor confined to the immediate vicinity of the arrest.*

18. Searches and Seizures—Without Warrant—Hot Pursuit.

*Police officers while pursuing suspected felons inside an apartment and searching from room to room or in other areas where the suspects could reasonably be expected to be hiding have a right to seize certain objects which fall within their plain view; the right also exists, if the police, in good faith, believe the suspected felons to be present, to make a protective search for weapons.*

19. Searches and Seizures—Without Warrant—Hot Pursuit.

*The hot pursuit exception to the warrant requirement of the Fourth Amendment does not provide for an unlimited search (US Const, Am 4).*

20. SEARCHES AND SEIZURES—WITHOUT WARRANT—HOT PURSUIT—SUSPECT PRESENT.

> Police officers, even though they entered an apartment in hot pursuit of suspected felons, must, in order for a search without warrant of the apartment to be legal, have believed at the time of the search that the suspected felons were present in the apartment; once the officers became aware that the suspects were not in the apartment, the exigency which permitted the search without warrant no longer existed.

21. SEARCHES AND SEIZURES—WITHOUT WARRANT—HOT PURSUIT.

> Search of defendant's apartment and seizure of evidence without a warrant was legal where the evidence was discovered by the police as they moved from room to room searching places where suspected felons, whom they were hotly pursuing, might have been hiding and where, at the time the evidence was seized, the police reasonably believed the felons to be in the apartment; however, a continued search of the apartment and seizure of evidence by the police after they were satisfied that the felons were not in the apartment were illegal.

22. SEARCHES AND SEIZURES—AUTOMOBILES—HOUSES—CONSTITUTIONAL LAW.

> A constitutional difference exists as to searches of automobiles and searches of houses.

23. SEARCHES AND SEIZURES—AUTOMOBILES—WITHOUT WARRANT—AFTER ARREST.

> A search without warrant of an automobile made at the police station some time after the defendant's arrest cannot be justified as a search incident to an arrest; however, the search can be justified on the basis of the existence of probable cause at the time the automobile was originally stopped.

24. SEARCHES AND SEIZURES—AUTOMOBILES—PROBABLE CAUSE.

> Search of the defendant's automobile and seizure of evidence found in the automobile were without probable cause where the police had no information that the car was used in any crimes, including the one defendants were convicted of.

25. CONSTITUTIONAL LAW—EVIDENCE—HARMLESS ERROR.

> The Court, before a Federal constitutional error can be held harmless error, must be able to declare a belief that the error was harmless beyond a reasonable doubt.

26. Criminal Law—Evidence—Cumulative Evidence—Harmless Error—Constitutional Law.

*Admission of illegally obtained evidence, although cumulative, was not harmless error where the prosecution's case was woven entirely from circumstantial evidence.*

27. Criminal Law—Evidence—Weapons—Stolen Weapon—Relevancy.

*Allowing a witness to testify that a gun admitted into evidence and found in the apartment of one of the defendants had been stolen from him was erroneous and prejudicial where the defendants were on trial for murder, and where the defendant's possession of the gun was undisputed because the testimony tended to show that the defendant had either committed the theft of the gun or had received stolen property and because the testimony was irrelevant.*

28. Criminal Law—Self-Incrimination—Right Not to Testify.

*A defendant's declination to testify at his own trial does not create any presumption against the defendant.*

Appeal from Kent, John H. Vander Wal, J. Submitted Division 3 May 7, 1970, at Grand Rapids. (Docket Nos. 6,801, 6,949, 7,293.) Decided November 27, 1970. Leave to appeal granted February 9, 1971. 384 Mich 802.

Jeffrey Carter, Harry Broyles and Howard McCully were convicted of murder during the course of a robbery. Defendants appeal. Remanded with instructions as to Carter. Affirmed as to Broyles and McCully.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *Donald A. Johnston, III,* Chief Appellate Attorney, for the people.

*John D. Tully* and *Thomas S. Evans,* for defendant Carter on appeal.

*Sherman H. Cone,* for defendant Broyles on appeal.

*Carl R. Fleetwood,* for defendant McCully on appeal.

Before: HOLBROOK, P. J., and BRONSON and MUNRO,* JJ.

HOLBROOK, P. J. The defendants were tried in Kent County Circuit Court, in a consolidated trial before a jury, and convicted of murder in the course of a robbery[1] and kidnapping. Sentences of mandatory life imprisonment were subsequently imposed as to each defendant. Their appeals have also been consolidated.

On December 1, 1967, at approximately 1:15 p.m., the automobile of the 67-year-old victim, Emile Osbeck, is alleged to have been used by defendants in the perpetration of an armed robbery of a Grand Rapids, Michigan bank. Defendants were not charged with that robbery nor with murder committed in the course of the bank robbery. Osbeck had departed from home at approximately 12:30 p.m. and was next observed at a paint and wall-paper store where he purchased, among other things, three gallons of paint, white, beige, and grey. Carrying the paint which he had purchased, Osbeck left the store at approximately 12:50 p.m., proceeding in the direction of the parking lot. This was the last time he was seen alive.

At approximately 1:17 p.m., the Osbeck automobile was seen parked a short distance from the scene of the bank robbery. Three men were seen to emerge from the car, open the trunk and flee on foot. Al-

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] MCLA § 750.316 (Stat Ann 1954 Rev § 28.548).

though the witness was subsequently unable to identify the defendants as occupants of the automobile, she was able to state that one of the fleeing men "had something white on and one had something red on".

The Grand Rapids police were summoned and led to the parked Osbeck automobile at about 1:20 p.m. by a man who had observed the automobile with its trunk open and the body of Osbeck in the trunk. The container of white paint had apparently overturned in the front seat of the car, and some paint was tracked away. Footprints led from the automobile, through a light snow in which the tracks could be discerned, to a three-unit apartment complex. One of the apartments was occupied by defendant McCully and his wife; another of the apartments was occupied by defendant Broyles. A few feet inside the doorway to the apartment building an officer observed a spot of white paint. The officer than called for assistance from other officers.

Upon entering the apartment building the officers obtained permission from Mrs. McCully to search the McCully apartment for suspects but, finding no one there, they proceeded upstairs. Directly in front of the door leading to defendant Broyles' apartment the officers saw "a spot on the floor that looked like water as if someone had been standing there with wet shoes". They knocked and, receiving no answer, entered the apartment, continuing their pursuit of the fleeing suspects. While in pursuit, the officers, without a warrant, seized a pair of shoes smeared with white paint still wet, a red-hooded sweatshirt, with a hole in the sleeve, and a brown paper sack containing $943 in bills, the serial numbers of which matched those stolen from the bank. After the officers had apparently decided that no one was present in the Broyles' apartment, they

called for a crime search team which found a .22-caliber German revolver in a steel cabinet, and $1,740 in stolen bank bills, wrapped in a cloth, under a cushion of an overstuffed chair. Testimony indicated, however, that only the $1,740 was found after officers had determined that the people they had gone into the apartment to look for were not there. All of the foregoing items were introduced into evidence at the trial over objections by the defendants.

At 2:20 p.m., defendants Broyles and McCully appeared at the Grand Rapids Hall of Justice to be sentenced on a previous conviction. After being sentenced, and while in police custody, Broyles and McCully were arrested and charged in the Osbeck murder.

Testimony revealed that defendants picked up one Gilmore Welford in McCully's 1965 green and white Buick automobile on the way to the courthouse. Upon arriving at the courthouse, McCully gave Welford the keys to the car and requested him to drive the car to the McCully residence. Welford drove the McCully automobile to a downtown bank to cash a check and then proceeded to the McCully apartment. Welford, after parking the car nearby, proceeded up to the apartment, but was apparently prevented by police officers from entering. Welford then drove the McCully automobile to a nearby poolroom, parking the automobile across the street. Shortly thereafter the police took Welford into custody as a material witness and seized and impounded the McCully automobile.

Defendant Carter was charged with the instant offense on January 11, 1968, although arrested on December 14, 1967 for an unrelated crime.

On December 2, 1967, officers returned to the apartment building with a warrant, seizing from

McCully's apartment $1,500 which appears to have been stolen from the bank, a .25-caliber pistol, and .22-caliber ammunition. These items were introduced into evidence at the trial.

On December 4, 1967, three days after the McCully automobile was seized and impounded, the police, without a warrant, searched the automobile and found several .22 and .25 caliber cartridges in the glove compartment. These items were, likewise, introduced into evidence despite timely objections and a pretrial motion to suppress.

During the trial, the prosecutor's theory was that Osbeck had been accosted by the defendants shortly after departing from the paint store, that defendants forced Osbeck to get into the trunk of his car, and proceeded to utilize the Osbeck automobile in the perpetration of the bank robbery, and that Osbeck, once inside the trunk, suffered a heart attack brought on by fear and excitement. Since the heart attack was fatal and death occurred during the course of the theft of the automobile, i.e., a robbery, this constituted first-degree murder. None of the defendants testified at the trial.

The issues which are dispositive of this appeal, consolidated where possible, are restated and dealt with in order.

I

*Was it error to admit into evidence all of the items seized by the police, without a warrant, while searching defendants' apartments in pursuit of suspected felons?*

Defendant Broyles contends that no justification existed for the search of his residence without a warrant on December 1, 1967, because neither the defendant nor anyone else was present and there

was, therefore, no need to search to discover hidden weapons nor to prevent destruction of evidence. Defendant Broyles' brief on appeal states in part, in reference to the search by the officers of his apartment:

"Upon determining no one was present, they proceeded to search the same, seizing money from the bank, shoes with paint on them, and clothing."

It should be noted that the defendants Broyles and Carter adopt the statement of facts contained in the brief of defendant McCully. That brief refers to the officers' seizure of numerous items, *including* money, shoes, and clothing. We consider, therefore, that defendant Broyles' argument relates to all of the evidence seized during the period of time while the officers were present in the apartment without a warrant.

The people contend that the seizures on December 1, 1967, were incident to a lawful and reasonable search for felons of whom the police were in hot pursuit; that only unreasonable searches are unlawful, *People* v. *Gonzales* (1959), 356 Mich 247; *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684, 6 L Ed 2d 1081); and that a search of the type which occurred here was reasonable, *People* v. *McDonald* (1968), 13 Mich App 226.

The search of defendant Broyles' apartment on December 1, 1967, was not incident to his arrest, since the search was neither substantially contemporaneous with, nor confined to the immediate vicinity of, the arrest of the defendant. *Stoner* v. *California* (1964), 376 US 483 (84 S Ct 889, 11 L Ed 2d 856). However, the search was within the scope of the "hot pursuit" exception to the search warrant requirement, *i.e.*, a search made in the pursuit of fleeing felons for fruits or instrumentalities of

crime, or contraband, as to certain of the evidence seized. *Warden, Maryland Penitentiary* v. *Hayden* (1967), 387 US 294 (87 S Ct 1642, 18 L Ed 2d 782). The $943 in bills, a red-hooded sweatshirt of the type and color worn by one of the bank robbers, and shoes covered with white paint, still wet when found by police officers, all of which evidence linked defendants to the crime charged and was seized within the officers' plain view, *Harris* v. *United States* (1968), 390 US 234 (88 S Ct 992, 19 L Ed 2d 1067), during the officers' pursuit of the suspects while searching areas of Broyles' apartment, where the suspects could reasonably have been found[2] were admissible in evidence. *Warden, Maryland Penitentiary* v. *Hayden, supra.*

The testimony revealed that the officers, while still in pursuit of the suspects, called for the identification bureau to come to the scene and that, upon their arrival, the apartment was again checked over. By this time it appears that the officers had made a complete determination that the people, in pursuit of whom the officers had gone into the building, were not there. Additionally, the apartment building was, by this time, surrounded by officers. After arrival of the identification bureau the officers found a .22 caliber German revolver in a metal clothes cabinet, and a package, under the cushion of a chair, containing $1,740 in stolen bills.

The additional items were erroneously admitted into evidence, since the exigencies of the situation at the time of their seizure were not such as to make the warrant requirement unreasonable nor to make the search taken without a warrant imperative. *Warden, Maryland Penitentiary* v. *Hayden, supra;*

---

[2] The officers noticed shoe marks on the wall and a bent clothes bar beneath the attic door, they opened the attic door, which was ajar, and found $943 in bills in a paper sack; they found the red-hooded sweatshirt in a closet and the paint-covered shoes under a bed.

*Terry* v. *Ohio* (1968), 392 US 1, 18, 19 (88 S Ct 1868, 1878; 20 L Ed 2d 889, 903, 904).[3] We rule, however, that the improperly admitted evidence, *i.e.,* the .22 caliber revolver and $1,740 in bills, was cumulative in nature, and its admission was harmless error. *People* v. *Kregger* (1953), 335 Mich 457. Such evidence was clearly less probative than were the paint-covered shoes, seized with other properly admitted evidence obtained during hot pursuit. This holding is further justified by the proper admission into evidence of several items seized from defendant McCully's apartment on December 2, 1967, pursuant to a valid search warrant, *i.e.,* $1,500 found under the bathtub wrapped in a towel, which money appeared to have been stolen from the bank, a .25 caliber pistol found in a child's play pail on top of a metal clothes closet, and .22 caliber ammunition found on a chest in a bedroom. To conclude that admission of the improperly seized evidence was harmless error requires a finding beyond a reasonable doubt that the error did not contribute to the defendants' conviction, *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284). In view of the quantity and nature of the evidence properly admitted, we are persuaded beyond a reasonable doubt that the improperly admitted evidence was not of such probative value as to have contributed to the conviction of the defendants. This determination is based upon our own review of the record and upon what seems to have been the probable impact of such evidence upon the minds of an average jury. We cannot impute re-

---

[3] " * * * [a] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope. * * * The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."

versible weight to the improperly seized evidence. *Harrington* v. *California, supra.*

## II

*Was the search of defendant McCully's automobile, without a warrant, three days after McCully had been arrested and the car taken into custody by the police, an unlawful search, rendering the evidence seized inadmissible?*

The warrantless search of defendant McCully's automobile on December 4, 1967, three days after the arrest of defendants McCully and Broyles and the impounding of the car, produced .22 and .25 caliber ammunition from the glove compartment, which was admitted into evidence at the trial. Defendant McCully contends that the items seized from his automobile, and subsequently admitted into evidence, were the products of an illegal search, carried out without the authority of a search warrant and not incident to a lawful arrest, and that the erroneous admission of the evidence seized requires a reversal of defendant McCully's conviction.

The people counter by asserting that, upon the basis of the recent case of *Chambers* v. *Maroney* (1970), 399 US 42 (90 S Ct 1975, 26 L Ed 2d 419), the evidence found in defendant McCully's automobile was properly admissible as the product of a reasonable search and seizure.

The *Chambers* case persuades this Court that a new interpretation is to be given to the Fourth Amendment as regards searches of automobiles. In *Chambers* the pertinent facts were stated in part, pp 44, 45:

"During the night of May 20, 1963, a Gulf service station in North Braddock, Pennsylvania, was robbed by two men each of whom carried and dis-

played a gun. The robbers took the currency from the cash register; the service station attendant, one Stephen Kovacich, was directed to place the coins in his right hand glove, which was then taken by the robbers. Two teenagers, who had earlier noticed a blue compact station wagon circling the block in the vicinity of the Gulf station, then saw the station wagon speed away from a parking lot close to the Gulf station; about the same time, they learned that the Gulf station had been robbed. They reported to police, who arrived immediately, that four men were in the station wagon and one was wearing a green sweater. Kovacich told the police that one of the men who robbed him was wearing a green sweater and the other was wearing a trench coat. A description of the car and the two robbers was broadcast over the police radio. Within an hour, a light blue compact station wagon answering the description and carrying four men was stopped by the police about two miles from the Gulf station. Petitioner was one of the men in the station wagon. He was wearing a green sweater and there was a trench coat in the car. The occupants were arrested and the car was driven to the police station. In the course of a thorough search of the car at the station, the police found concealed in a compartment under the dashboard two .38 caliber revolvers (one loaded with dumdum bullets), a right hand glove containing small change, and certain cards bearing the name of Raymond Havicon, the attendant at a Boron service station in McKeesport, Pennsylvania, who had been robbed at gun point on May 13, 1963. In the course of a warrant-authorized search of petitioner's home the day after petitioner's arrest, police found and seized certain .38 caliber ammunition, including some dumdum bullets similar to those found in one of the guns taken from the station wagon."

It was ruled there at 49:

"The Court also noted that the search of an auto on probable cause proceeds on a theory wholly different from that justifying the search incident to an arrest:

" 'The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law.' *Carroll* v. *United States* [1925] 267 U.S. 132, 158, 159.

\* \* \*

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." 399 US at 52.

The principle set forth in *Chambers,* and quoted above, is applicable to the instant case. As enunciated there, a warrantless search of an automobile, made sometime after the arrest while the car was in police custody, is legally made, provided " \* \* \* that there was probable cause to have believed that the car contained articles that the officers were entitled to seize." Probable cause must have existed at the time the car was originally stopped or seized.

An eyewitness to the robbery, the temporary branch manager of the bank in question, testified that after the commission of the crime he observed the three felons go to and enter a waiting car and that he reported his observation to the police.

Additionally, the testimony of a member of the Grand Rapids police department showed that radio messages based upon a description of the felons and the vehicle had prompted the investigation involving a green Buick.

It is clear that many cases of criminal activity are consummated with stolen automobiles in order to prevent identification of the participants. In view of the police radio transmissions concerning a green Buick in police investigations of the crimes committed by the defendants and the spotting by officers of a green Buick in the custody of Gilmore Welford, which was seen driven to the McCully residence on the afternoon of the crimes in question, the subsequent seizure and impounding shortly thereafter of the vehicle, identified as belonging to defendant McCully, was proper. We rule that the police had probable cause to believe that the vehicle contained contraband and was connected with a criminal activity.

While the *Chambers* case, *supra,* has broadened the rule permitting search and seizure of motor vehicles it is not to be construed as authorizing a three-day wait before performing a warrantless search, particularly where the vehicle has been in the possession of law enforcement authorities throughout the three-day period. If, as here, the officers have probable cause to search the vehicle, we hold that such search must be made within a reasonable time as the circumstances permit, otherwise, a warrant for the search must be obtained. However, we further find that the admission of evidence so seized was not so prejudicial as to constitute reversible error, since such evidence was only cumulative to properly-admitted evidence and no miscarriage of justice resulted from its admission. *People* v. *Loncar* (1966), 4 Mich App 281;

MCLA § 769.26 (Stat Ann 1954 Rev § 28.1096); and GCR 1963, 529.1.

## III

*Did the trial court's failure to order separate trials prejudice the rights of the defendants?*

By statute, the granting of separate trials is within the sound discretion of the trial judge. MCLA § 768.5 (Stat Ann 1954 Rev § 28.1028). Where, as in the instant case, the defendants are charged with the same crime and the same evidence is to be used to implicate all the defendants in the joint commission of the crime, the denial of motions for separate trials is not an abuse of discretion. *People* v. *Newsome* (1966), 3 Mich App 541; *People* v. *Cooper* (1950), 326 Mich 514; *People* v. *Schram* (1966), 378 Mich 145.

## IV

*Did the trial court commit reversible error by admitting into evidence testimony which tended to show that defendant McCully had obtained a revolver in a previous unconnected theft?*

Witness Chatfield Young, a grocery store owner, was allowed to testify, over objection of defense counsel, that he was the owner, under a concealed weapons permit, of a .25 caliber automatic pistol,[4] introduced into evidence at the trial, that the pistol had disappeared some months before December 1, 1967, and that he had reported the gun missing to police on the day of its disappearance. A police officer was also called as a witness and his testimony

---

[4] The gun is the .25 caliber pistol found by officers in defendant McCully's apartment on December 2, 1967, pursuant to a lawful search with a warrant.

verified the fact that witness Young had reported the revolver missing from his store.

The defendants contend that, since the fact that the gun was found in defendant McCully's apartment was undisputed, it was error to allow testimony tending to show that the gun had been stolen from its lawful owner, and that such testimony was immaterial and prejudicial to them in that its sole purpose was to indicate to the jury that they were guilty of having stolen the gun.

After the testimony of Mr. Young and the police officer had been presented, defendants moved for a mistrial. The trial judge, in denying the motion, stated in part:

"It isn't the identification of the gun, it is the identification of the person. That is important here.

"Now, there was no reference made to Mr. Young's testimony about the fact that his store had been broken into, he had been held up. If that had been true, that was brought out I would have to stop it but, upon police investigating this case they found out that this gun is owned by Young. All right, did Young let somebody use it that day? Did Young sell it to somebody? Not for the purpose of tracing the gun but for the purpose of identifying and tracing the people so when the Prosecutor offers it for that purpose I think it is very material. He very carefully kept out and I would have, if it had been brought out that Mr. Young's store was held up, or broken into, or things were stolen including this gun, I think your Motion would be well taken. That was very carefully eliminated. For that reason there is no prejudicial error against anyone of these three respondents."

While the prosecutor's questions were carefully phrased so as to exclude the specific question of

whether the pistol was "stolen", we rule that it was error for the court to admit into evidence the testimony here under consideration, because it was irrelevant to the crimes charged. However, we deem that the erroneous admission of this testimony was not prejudicial to defendants and does not call for reversal of the convictions. The testimony elicited did not reveal imprisonment of defendants in connection with other criminal activity, nor did it show other crimes committed by defendants, such as occurred in the cases cited by defendants. With due consideration having been given to the record in this case, we conclude that the verdicts would not have been different had the objectionable testimony been excluded. MCLA § 769.26 (Stat Ann 1954 Rev § 28.1096); GCR 1963, 529.1.)

## V

*Did the trial court commit error in instructing the jury regarding the defendants' exercise of their right not to testify?*

The trial court instructed the jury in part as follows:

"None of the respondents in this case have taken the witness stand. Neither were they required to because of this principle of law known as the presumption of innocence. The burden is upon the prosecutor. They are not required to take the witness stand. And the fact, *that fact standing alone,* may not be considered by you as evidence of their guilt. The fact that they did not take the witness stand does. not form a presumption either of their guilt or of their innocence." (Emphasis supplied.)

Defendants contend that the use of the words "that fact standing alone" permits the implication that the jury may consider defendants' failure to

testify in conjunction with other factors in the case and that the instruction was, therefore, erroneous and prejudicial.

While the trial court's use of such terminology was inadvertent, the instructions when considered as a whole clearly show that the jury was instructed that this fact was not to be considered by them as forming a presumption, as to either the guilt or innocence of defendants. We rule that defendants' rights were fully protected by the instructions as given. *People* v. *Arntson* (1968), 10 Mich App 718; *People* v. *Murnane* (1921), 213 Mich 205; *People* v. *Nankervis* (1951), 330 Mich 17.

## VI

*Did the trial court commit reversible error in identifying a portion of its charge to the jury as having been requested by defendants?*

The trial court instructed the jury in part as follows:

"When the evidence in a case consists of a chain of well authenticated and proven circumstances it is often more convincing and satisfactory and gives a stronger ground of assurance of the defendant's guilt than the direct testimony of witnesses unconfirmed by circumstances.

"Now that means, *and the defendants have asked for this instruction,* and I am going to give it along that line. The prosecution, and you noticed I said authenticated, the prosecution, as part of its burden of proof must prove each and every link in its chain of evidence beyond a reasonable doubt. In other words it is like I said the chain of evidence must be authenticated. If any one link in the chain of circumstances has not been proved beyond a reasonable doubt then they have not proved their case." (Emphasis supplied.)

Defendants failed to comply with the applicable court rule,[5] but did state the following, after the jury had retired to consider a verdict:

"The court contrary to the established law in the state of Michigan identified a request as, I was asked to give this by the defendant having to do with the instruction each link of the crime which I feel is prejudicial and they should not be identified."

Defendants claim that the instruction, as given, was erroneous and prejudicial, because it suggested to the jury that they could disregard it as being an exercise in advocacy by the defendants. We do not agree. We rule that, in view of the brevity of the erroneous statement given the jury by the court, occurring in the midst of lengthy instructions encompassing some 33 pages, and in view of the fact that the instructions properly informed the jury as to the law applicable to the case, the error complained of was not prejudicial to defendants, and no manifest injustice occurred. *People* v. *Fred W. Thomas* (1967), 7 Mich App 519, 533, 534.[6]

---

[5] GCR 1963, 516.2 states as follows:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider the verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

See also, 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 565, 566 where it is stated that, where objection to an instruction is not timely made, there remains only the inherent power of the appellate court to reverse plain error in order to avoid manifest injustice.

[6] "It was improper for the court to submit the requested instructions as having emanated other than from the court. *Reetz* v. *Rigg* (1962), 367 Mich 35; *People* v. *Hunter* (1963), 370 Mich 262. To determine whether there has been reversible error, we consider the facts surrounding the error committed. When it involves court instructions, we consider the entire context of the charge.

"We have no right to reverse these convictions or grant a new trial unless we are satisfied that there was such error committed as deprived the defendants of substantial rights or resulted in a miscarriage of justice. *People* v. *Pizzino* (1945), 313 Mich 97. CL 1948, § 769.26 (Stat Ann 1954 Rev § 28.1096)."

## VII

*Did the prosecutor violate defendant Carter's right to due process by failing to release to his attorney an alleged exculpatory statement made by defendant Broyles?*

The statement in question is not a part of the record and was not used by the prosecution in the trial of this case. However, defendant Carter asserts that the statement, taken from defendant Broyles on the day of the crime, indicated that defendants Broyles and McCully picked up the third man (apparently unnamed in the statement), "after getting the car"; that, assuming the third man was Carter, there is a serious question as to whether he consented to the theft of the Osbeck car, the basis of the felony-murder charge; that some two and one-half months before trial, a motion for disclosure of exculpatory evidence was argued before the trial court, as a result of which the prosecutor agreed to turn any such evidence over to defense counsel; and, that no such evidence was disclosed. Counsel for defendant Carter, alleging that the statement was exculpatory as to his client, argues that he did not see the statement until several days after the commencement of trial, at which time counsel for defendant Broyles, to whom the prosecutor had furnished the statement after trial had begun, gave it to him. Counsel contends that Carter was denied due process of law because of this delay, in that he was prevented from using this statement to prepare his trial strategy and was further prevented from discovering other evidence by means of the statement.

There is no question but that the prosecutor acted in good faith. The prosecutor turned the statement over to one of the defense attorneys and reasonably

assumed that counsel for each defendant would have access to the statement. However, we cannot determine what effect the statement would have had upon the preparation and presentation of Carter's defense had it been timely disclosed to counsel for defendant Carter.

Defense counsel relies upon *Brady* v. *Maryland* (1963), 373 US 83, 87 (83 S Ct 1194, 1196, 1197; 10 L Ed 2d 215, 218) for the proposition that the good faith of the prosecutor is immaterial under the standards there imposed. In *Brady,* the statement of an accomplice, who was separately tried, was not brought to defendant's notice by the prosecution until after he had been tried, convicted, and sentenced, and his conviction affirmed. While the facts in *Brady* were stronger than those in the present case for remanding, the principle announced by the Supreme Court at pp 87, 88 appears to be applicable:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

* * *

"Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, * * * ."

We rule that this cause must be remanded as to defendant Carter for an evidentiary hearing to determine whether the statement in question was essential to a proper preparation by counsel of defendant Carter's case. If, as a result of the hearing, it is determined that defendant Carter was prejudiced by a failure on the part of the prosecutor to timely proffer the statement to Carter's counsel, a new trial shall be had as to him, otherwise, the conviction is affirmed.

The other questions raised by defendants are without merit and need not be discussed.

Affirmed as to defendants Broyles and McCully. Remanded as to defendant Carter, for further proceedings consistent with this opinion.

MUNRO, J., concurred.

BRONSON, J. (*dissenting*). The defendants were convicted by a jury in a consolidated trial for murder in the course of a robbery[1] and kidnapping. Sentences of mandatory life imprisonment were subsequently imposed.

## I. FACTS

The crimes alleged to have been committed by the defendants took place in Grand Rapids on December 1, 1967. On that day one Emile Osbeck, the 67-year-old victim, ate lunch at his home in Grand Rapids. Osbeck departed from his home by car at approximately 12:30 p.m. and was next observed at a paint and wallpaper shop where he purchased several gallons of paint. Mr. Osbeck, carrying the paint which he had purchased, left the store, proceeding in the direction of the parking lot, at

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548) (felony-murder).

approximately 12:50 p.m. This was the last time that he was seen alive.

At approximately 1:15 p.m. Osbeck's automobile is alleged to have been used by the defendants in the perpetration of an armed robbery of a Grand Rapids bank. Although the defendants were not charged with the bank robbery nor with murder committed in the course of the bank robbery, the evidence at trial consisted of proofs tending to show the defendants' involvement in the bank robbery. In fact, establishing defendants' involvement in the bank robbery in which the thieves fled in Osbeck's car was imperative to the prosecution's case, a case based entirely upon circumstantial evidence.

A few minutes after the bank robbery, at approximately 1:17 p.m., the Osbeck automobile was seen parked a short distance from the scene of the bank robbery. A witness observed three men emerge from the automobile, open the car trunk, and flee on foot. The witness, however, was unable to subsequently identify any of the defendants as the occupants of the automobile, although she did state that "one had something white on and one had something red on". The Grand Rapids police discovered the parked automobile at approximately 1:20 p.m. and found the body of Emile Osbeck in the trunk.

A container of paint located in the front seat of the automobile had been apparently overturned and the wet white paint had been stepped in by the occupants. The police followed the footprints leading from the automobile—some paint was tracked away from the automobile and there had been a light snow in which the tracks could be discerned. The footprints led the police to an apartment building which consisted of three separate apartment units. Inside the apartment building the officers observed a spot

of fresh white paint. As was subsequently discovered, defendant McCully and his wife had been living in the first floor apartment; the second floor apartment was rented by defendant Broyles.

Upon entering the apartment building, the officers knocked on the door of defendant McCully's apartment and were greeted by Mrs. McCully. Mrs. McCully permitted the officers to search the apartment for suspects, but finding no one inside, the officers proceeded upstairs. Directly in front of the door leading to defendant Broyles' apartment, the officers noticed "a spot on the floor that looked like water as if someone had been standing there with wet shoes". Having failed to receive an answer, the officers cautiously entered the apartment, continuing their pursuit of the fleeing suspects. Although the apartment was subsequently found to be empty, the officers, without a warrant, seized the following items: a pair of shoes smeared with white paint, a red-hooded sweatshirt with a hole in the sleeve, a brown paper sack containing $943 in bills, the serial numbers of which matched those of like denomination stolen from the bank, a .22 caliber German revolver, and $1,740 in bills stolen from the bank.

These items were admitted into evidence at trial, notwithstanding motions to suppress and objections tendered by the defendants. A more detailed discussion of the items seized, as well as the circumstances surrounding the search, will appear in a subsequent part of this opinion.

On the following day, December 2, 1967, the police officers returned to the apartment building with a search warrant and thoroughly searched the apartment units. Pursuant to this search warrant, the following items were seized from defendant McCully's apartment: $1,500, which appears to have

been stolen from the bank, a .25 caliber pistol, and
.22 caliber ammunition. These items were intro-
duced into evidence at trial.

Defendant Broyles and defendant McCully ap-
peared at the Grand Rapids Hall of Justice at
approximately 2:20 p.m. on December 1, 1967, to
be sentenced on a prior conviction. After being
sentenced and while in the custody of the Grand
Rapids police, both defendants were arrested and
charged with the murder of Emile Osbeck. De-
fendant Carter, although arrested on December 14,
1967, for an unrelated crime, was charged with the
instant offense on January 11, 1968. A Mr. Welford,
who was in possession of defendant McCully's
automobile, was taken into custody later in the
afternoon of December 1, 1967. Defendant Mc-
Cully's automobile, which had been parked by Mr.
Welford outside a pool hall, was seized and im-
pounded by the police at that time. On December 4,
1967, three days after the automobile was seized and
impounded, the police, without obtaining a warrant,
searched defendant McCully's automobile and dis-
covered several .22 and .25 caliber cartridges in the
glove compartment. These items were likewise
introduced into evidence despite timely objections
and motions to suppress.

During the trial the prosecutor's theory was that
Osbeck had been accosted by the defendants shortly
after departing from the paint store. The defend-
ants forced Osbeck to get into the trunk of his car,
and then the defendants proceeded to utilize Osbeck's
automobile in their perpetration of the bank robbery.
Mr. Osbeck, once inside the trunk, suffered a heart
attack brought on by fear and excitement.[2] Since

---

[2] Three doctors, including the autopsy surgeon, testified at trial
that Osbeck had an enlarged heart brought about by arteriosclerosis.
However, it was their conclusion in response to hypothetical ques-

the heart attack was fatal and since the death occurred during the perpetration of the *theft of his automobile*, and thus a robbery, under CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548), that incident constituted first-degree murder.[3] None of the defendants testified at trial.

A total of 26 issues have been raised by the defendants on appeal, but I do not deem it necessary to discuss all of them. Before proceeding, I should point out that the nature of this crime, as well as the termination of an innocent person's life, have not made the performance of my duty easy. Yet, as distasteful as the outcome of a particular case may be, or the criticism which it may evoke, a judge must steadfastly adhere to and observe the principles and safeguards of human liberty enumerated in the Constitution of the United States. For, where conflict arises between constitutionally-guaranteed rights and expediency, the latter must yield.

Having made these prefatorial comments, I turn to the legal issues which I conclude make reversal of the instant convictions obligatory.

## II.

*Whether it was error to admit into evidence all of the items seized by the police, without a warrant, while searching defendants' apartments in pursuit of suspected felons?*

A warrantless search is not necessarily violative of the Fourth Amendment of the United States Constitution.[4] Certain recognized exceptions to the

tions that the emotional trauma of the incident caused the fatal seizure.

[3] For a recent discussion pertaining to Michigan's felony-murder rule see Comment, Homicide Under the Michigan Revised Criminal Code, 14 Wayne L Rev 904, 913 (1968).

[4] However, the importance of obtaining a valid search warrant in most situations cannot be overemphasized. The Supreme Court,

warrant requirement have been established, based upon the premise that in those exempted situations the warrant requirement itself is unreasonable. In other words, the exigencies of the situation do not make the warrantless search unreasonable.[5]

Judge LEVIN, in *People* v. *McDonald* (1968), 13 Mich App 226, 232, 233, stated:

"Searches, incident to a lawful arrest, *or following a hot pursuit* for instruments used in the commission of crime, its fruits, contraband and means of escape, have been held to be reasonable. *But that does not mean every search incident to an arrest or following a hot pursuit is justified.*" (Emphasis added.)

In the instant case the search was not incident to an arrest,[6] because the search was not substan-

___

in *Chimel* v. *California* (1969), 395 US 752, 761 (89 S Ct 2034, 2039, 23 L Ed 2d 685, 692, 693), recently reiterated the purpose of the Fourth Amendment and the warrant requirement:

" * * * The Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence. In the scheme of the Amendment, therefore, the requirement that 'no Warrants shall issue, but upon probable cause,' plays a crucial part. As the Court put it in *McDonald* v. *United States* (1948), 335 US 451, 69 S Ct 191 (93 L Ed 153):

"'We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. * * * And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.' *Id.,* at 455–456."

[5] *E.g., Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868, 20 L Ed 2d 889).

[6] The two defendants arrested on December 1, 1967 were in fact arrested in a different part of town, while in police custody, approximately one hour after the instant search. "If a search of a

tially contemporaneous with the arrest nor confined to the immediate vicinity of the arrest. See *Stoner v. California* (1964), 376 US 483 (84 S Ct 889, 11 L Ed 2d 856); *Agnello* v. *United States* (1925), 269 US 20 (46 S Ct 4, 70 L Ed 145); *Mosco* v. *United States* (CA 9, 1962), 301 F2d 187. The search was completely unrelated to the arrest, both as to time and place. See *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881, 11 L Ed 2d 777); *Stoner* v. *California, supra.*

The facts of the instant case do, however, bring the warrantless search, at least initially, within the scope of the so-called "hot pursuit" exception. *Warden, Maryland Penitentiary* v. *Hayden* (1967), 387 US 294 (87 S Ct 1642, 18 L Ed 2d 782).[7] That is, the search was made in the course of "hot pursuit" of fleeing felons. While pursuing the suspected felons inside an apartment, the police, searching from room to room or in other areas where the suspects could reasonably have been expected to be hiding, have a right to seize certain objects which fall within their plain view. *Harris* v. *United States* (1968), 390 US 234 (88 S Ct 992, 19 L Ed 2d 1067); see *People* v. *Eddington* (1970), 23 Mich App 210.

There also exists the right, if the police in good faith believe the suspected felons to be present, to make a protective search for weapons to prevent "gravely endangering their lives or the lives of others." *Warden, Maryland Penitentiary* v. *Hayden, supra.*

---

house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, * * * not somewhere outside * * * ." *Vale* v. *Louisiana* (1970), 399 US 30 (90 S Ct 1969, 26 L Ed 2d 409). (Emphasis and citations omitted.)

[7] The "hot pursuit" exception to the warrant requirement was recently reaffirmed, by means of dictum, in *Vale* v. *Louisiana, supra.* In *Vale*, the Court cited, in addition to *Hayden*, *Chapman* v. *United States* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705), and *Johnson* v. *United States* (1948), 333 US 10 (68 S Ct 367, 92 L Ed 436), as precedent for the "hot pursuit" exception.

The "hot pursuit" exception does not, however, provide for an unlimited warrantless search. *Warden, Maryland Penitentiary* v. *Hayden, supra; People* v. *McDonald, supra.* For the warrantless search to be legal in the instant pursuit situation, a fundamental prerequisite is that the police officers reasonably have believed that the pursued suspects were present in the apartment.[8] Once the officers became aware of the fact that the suspects were not in the apartment, the exigency which permitted the warrantless search no longer existed.[9]

Therefore, the crucial issue is whether the objects seized during this warrantless search occurred during the pursuit of the suspected felons *and* while the officers reasonably believed the felons to be present. I conclude that the search and seizure of some of the items occurred *after* the officers discovered that the suspected felons were not present and, therefore, part of the search was illegal. Thus, it was error to admit the fruits of this illegal search into evidence.

Of the items seized, I conclude that the warrantless search and seizure which produced the following items was reasonable: a pair of shoes smeared with white paint, a red-hooded sweatshirt with a hole in

[8] In *Warden, Maryland Penitentiary* v. *Hayden* (1967), 387 US 294, 299 (87 S Ct 1642, 1646; 18 L Ed 2d 782, 787), the Court stated:

"The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the *suspect at large in the house* may resist or escape." (Emphasis added.)   See *Vale* v. *Louisiana, supra,* note 6.

[9] A warrantless search, legal at its inception, may be seen to traverse the boundaries of legality. As stated by the Court in *Terry* v. *Ohio* (1968), 392 US 1, 18, 19 (88 S Ct 1868, 1878; 20 L Ed 2d 889, 903, 904):

"[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity in scope * * * . The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."

the sleeve,[10] and a brown paper bag containing $943 in bills. These items were seized by the police in the course of their pursuit of the fleeing felons. The items were discovered as the officers moved from room to room reasonably searching places where the suspected felons might be hiding. Also, the items were discovered while the police reasonably believed the felons to be present in the apartment.

However, the warrantless search and seizure which produced the .22 caliber revolver and the $1,740 in stolen bills was conducted after the police concluded that the suspected felons were not present; the necessity for a protective search at that stage had ceased.

At the preliminary examination the investigating officer testified as to what occurred after the apartment had been searched for the suspected felons:

"I then called for the Police Identification Bureau Crime Lab for a crime search team to come to the scene to search the apartment. We waited for some period of time as they were working on the car at the parking lot. Officers Karpowicz and DeBok arrived at the scene [apartment], and they proceeded to check the crime scene [apartment]. We tagged the shoes and the red, pull-over jumper. I had the money already tagged. Officer Karpowicz and I located a .22 caliber Rohm pistol in the steel cabinet in the—at the foot of the bed in the bedroom in the apartment, and Officer Karpowicz was standing. I was standing right alongside of him and lifted up the seat of an overstuffed chair in the living room, which would be the center room of the three-room apartment; and under the seat was found another package of money [$1,740]."

---

[10] This sweatshirt fit the description the officers had of clothing worn by one of the fleeing bank robbers.

Likewise, at trial the investigating officer testified
as follows with respect to the seizure of the .22
caliber revolver and the $1,740 in bills.

(*Direct examination*):

"*Q.* Now what is the next thing that you recall
you observed?

"*A.* We had the sweatshirt and the shoes and
some money so I called for the identification bureau
to come to the scene and at that time Officers
Karpowicz and DeBok arrived at the scene and we
checked the apartment over, in the metal cabinet
in the bedroom of the south apartment, upstairs
south apartment we found a revolver.

"*Q.* What type of revolver was it?

"*A.* A German make, I believe a Rohm.

"*Q.* Do you know the caliber of it?

"*A.* .22 I believe.

\*   \*   \*

"*Q.* What next then Inspector Pierce?

"*A.* Officer DeBok lifted the cushion of the chair
in the middle room you have the kitchen and then
you have this middle room and a bedroom.  He
lifted the cushion on the chair and there was a pack-
age in the chair we unwrapped the packed [*sic*] it
contained some money.

"*The Court:* What apartment are you talking
about?

"*A.* The upper south apartment, 648 Prospect.

"*The Court:* Is that the one you refer to as the
Broyles apartment?

"*A.* That is correct.

"*Q.* You said he lifted the cushion and you saw?

"*A.* The package was under the cushion.

"*Q.* And you found what under the cushion?

"*A.* About $1,700.

"*Q.* Money?

"*A.* Yes, sir.

"*Q.* Was it wrapped in anything?

"*A.* A cloth."

\*    \*    \*

(*Cross examination*):

"*Q.* Is this after you had already decided there was not any people in the Broyles apartment?

"*A.* This particular find was afterwards, yes, sir.

"*Q.* In other words you weren't lifting up the cushion to see if there was anybody under the cushion?

"*A.* No, sir.

"*Q.* So that search that you are now describing was done after you had made a complete determination that the people you had gone into the house and were looking for, were not in fact there?

"*A.* Yes, sir.

"*Q.* And you still hadn't gotten the one?

"*A.* That is correct.

"*Q.* There wasn't any reason at this point that you couldn't have applied for a search warrant in the normal course was there?

"*A.* (*No answer.*)

"*Q.* You had the house surrounded didn't you Inspector?

"*A.* Yes, sir."

This extensive warrantless search, conducted after the officers were satisfied that the suspected felons were no longer present, cannot be accomplished under the pretense of "hot pursuit". The testimony discloses that several police officers were on the scene and that they had the apartment building surrounded. The exigencies of the situation were not such as to make the warrant requirement unreasonable. See *McDonald* v. *United States* (1948), 335 US 451 (69 S Ct 191, 93 L Ed 153); *Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868, 20 L Ed 2d 889). See, generally, *Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034, 23 L Ed 2d 685);

*Vale* v. *Louisiana* (1970), 399 US 30 (90 S Ct 1969, 26 L Ed 2d 409). The items thus seized should not have been admitted into evidence. *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684, 6 L Ed 2d 1081, 84 ALR2d 933).

### III.

*Whether the search of the defendant McCully's automobile, without a warrant, three days after McCully had been arrested and the car taken into custody by the police constituted an unlawful search?*

The items seized as the result of this warrantless search were .22 and .25 caliber ammunition. The items were found in the glove compartment of the car. Although motions to suppress and objections at trial were timely, the trial court admitted the items into evidence, relying on *Harris* v. *United States* (1968), 390 US 234 (88 S Ct 992, 19 L Ed 2d 1067), and *Cooper* v. *California* (1967), 386 US 58 (87 S Ct 788, 17 L Ed 2d 730). Defendant relied principally upon *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881, 11 L Ed 2d 777).

*Harris* can be distinguished since the objects seized in the instant case were not within the "plain view" of the officers. It has been suggested that *Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034, 23 L Ed 2d 685), although not recognized by this Court as retroactive,[11] instructs that the rule in *Preston,* decided before *Cooper,* is the controlling law.[12] However, the most recent examination of

---

[11] *People* v. *Sims* (1970), 23 Mich App 194; *People* v. *Herrera* (1969), 19 Mich App 216.

[12] In *Colosimo* v. *Perini* (CA 6, 1969), 415 F2d 804, 806, the court stated:

"With the person, or persons, suspected of crime and the automobile to be searched both in police custody, the precipitous action of a warrantless search is no longer justified. It is true that in *Preston* the vehicle was searched at a point away from the scene of arrest, while here the vehicle remained at the place where the defendant

this issue by the United States Supreme Court in *Chambers* v. *Maroney* (1970), 399 US 42 (90 S Ct 1975, 26 L Ed 2d 419), persuades this writer that a new interpretation is to be given to the Fourth Amendment with respect to searches of *automobiles*. That is, "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." *Id.* at 52.

Under *Chambers,* a warrantless search of an *automobile* may be legally made as incident to a lawful arrest *or* if "there is probable cause to believe that the car contains articles that the officers are entitled to seize." *Id.* at 48. See *Carroll* v. *United States* (1925), 267 US 132 (45 S Ct 280, 69 L Ed 543); *People* v. *Danny Williams* (1970), 383 Mich 549.

The rule enunciated by the Court in *Preston* remains authority for the proposition that a warrantless search of an automobile "made at the police station some time after the arrest * * * cannot be justified as a search *incident to an arrest*" because "the reasons which have been thought sufficient to justify warrantless searches carried out in connection with an arrest no longer obtain when the accused is safely in custody at the station house." *Chambers* v. *Maroney, supra,* at 47. (Emphasis added.)

However, even though a search and seizure under such circumstances cannot be justified as a search incident to a lawful arrest, the warrantless search of the automobile, conducted at the police station some time after the arrest, can be justified on the

was arrested. *Chimel,* however, persuades us that such factual distinction is not of controlling importance. We believe that *Chimel* instructs us that the rule of *Preston,* decided prior to the trial here involved, is the law that controls this case." See *People* v. *Sims, supra.*

basis of the existence of probable cause at the time the automobile was originally stopped:

"For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained. * * * "[13]

I conclude, however, after a careful examination of the record, that the officer who originally seized defendant McCully's automobile lacked probable cause to search the automobile at that time, and, therefore, the subsequent search of the automobile at the police station was illegal.

The instant case is factually dissimilar to that in *Chambers*. In *Chambers* the police had probable cause to believe, based upon information obtained from witnesses, that the defendants had committed a felony and were fleeing in a particular car. The police had a description of the car as well as its occupants. In addition, due to the proximity be-

[13] *Chambers* v. *Maroney* (1970), 399 US 42, 52 (90 S Ct 1975, 1981; 26 L Ed 2d 419, 428). See, generally, *People* v. *Danny Williams* (1970), 383 Mich 549; *People* v. *Zeigler* (1960), 358 Mich 355.

tween the commission of the crime and the pursuit
of the escaping felons, the police had reasonable
grounds to believe that the felons fleeing in the
automobile were in possession of guns and fruits
of the crime.

In the instant case, defendant McCully's automo-
bile was discovered parked outside a pool hall
around 2:40 p.m., approximately an hour and a
half after the discovery of the Osbeck automobile
which contained Mr. Osbeck's body.  No occupants
were observed in the parked automobile.  The offi-
cers had no information that defendant McCully's
automobile was used either in the instant crime
which resulted in Mr. Osbeck's death nor that Mc-
Cully's automobile was connected in any manner
with the bank robbery.  In fact, it was Mr. Osbeck's
automobile alone which was described as being used
by the fleeing bank robbers.  The police had no valid
reason to believe that defendant McCully's automo-
bile was the instrumentality of the crime.  The
record in the instant case is insufficient to justify
the conclusion that probable cause to search defend-
ant McCully's automobile existed at the time it was
seized.  See *Dyke* v. *Taylor Implement Manufactur-
ing Co.* (1968), 391 US 216 (88 S Ct 1472, 20 L Ed
2d 538).

Since the search of defendant McCully's automo-
bile was too remote in time and place to have been
incident to the arrest,[14] and further noting that the
officers lacked probable cause to search the automo-
bile at the time it was seized, I conclude that the
warrantless search of the impounded automobile
was illegal and that the items illegally obtained
should not have been admitted into evidence.  *Mapp*

---

[14] *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881, 11
L Ed 2d 777); *People* v. *Dombrowski* (1968), 10 Mich App 445.

v. *Ohio* (1961), 367 US 643 (81 S Ct 1684, 6 L Ed
2d 1081, 84 ALR2d 933).

## IV.

*Whether the admission into evidence of items
seized during the illegal searches constituted "harm-
less error"?*

Having concluded that the searches, or parts
thereof, were made in violation of the Fourth
Amendment of the United States Constitution, this
Court must determine if the use of the tainted evi-
dence at trial constituted harmless error. The
burden of establishing harmless error rests with
the prosecution and the standard of review is that
established by the United States Supreme Court in
*Chapman* v. *California* (1967), 386 US 18, 23, 24
(87 S Ct 824, 827, 828; 17 L Ed 2d 705, 710, 711):

"The California constitutional rule emphasizes 'a
miscarriage of justice,' but the California courts
have neutralized this to some extent by emphasis,
and perhaps overemphasis, upon the court's view of
'overwhelming evidence.' We prefer the approach
of this Court in deciding what was harmless error
in our recent case of *Fahy* v. *Connecticut* [1963],
375 US 85–87 (84 S Ct 229, 230; 11 L Ed 2d 171,
173). There we said: *'The question is whether there
is a reasonable possibility that the evidence com-
plained of might have contributed to the conviction.'*
Although our prior cases have indicated that there
are some constitutional rights so basic to a fair
trial that their infraction can never be treated as
harmless error, this statement in *Fahy* itself belies
any belief that all trial errors which violate the
Constitution automatically call for reversal. At the
same time, however, like the federal harmless-error
statute, it *emphasizes an intention not to treat as
harmless those constitutional errors that 'affect sub-
stantial rights' of a party. An error in admitting*

*plainly relevant evidence which possibly influenced
the jury adversely to a litigant cannot, under* Fahy,
*be conceived of as harmless.*  \* \* \*  We, therefore,
do no more than adhere to the meaning of our *Fahy*
case when we hold, as we now do, that *before a
federal constitutional error can be held harmless,
the court must be able to declare a belief that it
was harmless beyond a reasonable doubt.*"  (Emphasis added.)

The standard to be utilized in determining the
issue of harmless error, as established in *Chapman,*
was recently reaffirmed in *Harrington* v. *California*
(1969), 395 US 250, 254 (89 S Ct 1726, 1728, 1729;
23 L Ed 2d 284, 288):

"We do not depart from Chapman; nor do we
dilute it by inference.  We reaffirm it. *We do not
suggest that, if evidence bearing on all the ingredi-
ents of the crime is tendered, the use of cumulative
evidence, though tainted, is harmless error.*  Our
decision is based on the evidence in this record.
The case against Harrington was *not* woven from
circumstantial evidence."  (Emphasis added.)

Since the instant case was woven *entirely from
circumstantial evidence,* albeit a strong web, I am
not convinced beyond a reasonable doubt that the
constitutional error was harmless to defendants.
*Chapman* v. *California, supra; Harrington* v. *Cal-
ifornia, supra; People* v. *Teal* (1969), 20 Mich App
176; *People* v. *Mason* (1970), 22 Mich App 595.

OTHER ASSIGNMENTS OF ERROR

For the above-mentioned reasons, I would reverse
the convictions and remand the cause for a new trial.
In view of my decision on these issues, I will com-
ment only briefly upon the remaining assignments
of error.

## V.

*Whether the trial court's failure to order separate trials prejudiced the rights of the defendants?*

By statute, the granting of a separate trial is within the sound discretion of the trial judge. CL 1948, § 768.5 (Stat Ann 1954 Rev § 28.1028). Where, as in the instant case, the defendants are charged with the same crime and the same evidence is to be used to implicate all the defendants in the joint commission of the crime, the denial of a motion for separate trials is not an abuse of discretion. See *People v. Schram* (1966), 378 Mich 145; *People v. Cooper* (1950), 326 Mich 514; *People v. Newsome* (1966), 3 Mich App 541.

## VI.

*Whether the prosecutor violated the defendant Carter's right to due process by failing to release to Carter's attorney an alleged exculpatory statement made by defendant Broyles?*

Approximately two and one-half months before trial, a motion for the disclosure of exculpatory evidence was argued before the court. The prosecutor agreed to furnish exculpatory statements made by any of the defendants to the attorneys representing the defendants. However, prior to trial, the attorneys were not apprised of the existence of any exculpatory statements.

Shortly after trial began, the prosecutor disclosed defendant Broyles' statement to Broyles' attorney. However, defendant Carter's attorney, who now alleges that the statement was exculpatory[15] as to his client, did not see the statement until several days after the commencement of the

---

[15] The statement in question was not introduced into evidence at trial and is not part of the record on appeal.

trial, at which time counsel for defendant Broyles furnished him with the statement. There is no question in my mind but that the prosecutor acted in good faith. The prosecutor turned the statement over to one of the defense attorneys and reasonably assumed that counsel for each defendant would have access to the statement.

However, the good faith of the prosecutor is not sufficient. The Court, in *Brady* v. *Maryland* (1963), 373 US 83, 87 (83 S Ct 1194, 1196, 1197; 10 L Ed 2d 215, 218), held as follows:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Since I would remand this case for a new trial, I would also require that the prosecutor, upon request by defense counsel, be compelled to disclose to each attorney any exculpatory statements made by one of the codefendants. *Brady* v. *Maryland, supra.*

## VII.

*Whether the trial court erred by admitting into evidence testimony which tended to show that defendant McCully had obtained a revolver in a previous unconnected theft?*

During the course of the trial, the trial judge, notwithstanding objection by defense counsel, permitted a witness, Chatfield Young, to testify that he was the owner of the revolver discovered by the police in defendant McCully's apartment. Mr. Young further testified that the revolver had "disappeared" from his store a few months before the instant crime. A police officer was also called as a

witness and his testimony verified that Mr. Young had reported the revolver missing from his store.

The defendants objected to the testimony of both Young and the police officer on the basis that it was immaterial and prejudicial to their clients. It is argued on appeal that the sole basis for such testimony was to leave the inference that the defendants, or at least one of them, had stolen the revolver.

After the testimony of Young and the police officer had been presented, defendants moved for a mistrial. The trial judge denied the motion, reasoning that the prosecutor had carefully kept out the fact that Mr. Young's "store was held up, or broken into or things were stolen including this gun * * * . That was very carefully eliminated." While the prosecutor's questions were carefully phrased so as to exclude the specific question of whether the revolver was "stolen", the inference was clear.

In *People* v. *Greenway* (1962), 365 Mich 547, 551, the Michigan Supreme Court, quoting from *People* v. *Harry Fleish* (1948), 321 Mich 443, stated:

" 'There is no disposition to depart from the rule which in general is that as to a defendant who does not testify in his own behalf, evidence of former convictions *or offenses* is not admissible except in cases wherein such evidence is material and relevant to the issue being tried.' " (Emphasis added.)

In the instant case the defendants are charged with murder in the course of a robbery *of an automobile* and, in the trial judge's own words, "established and undisputed" evidence existed which proved that the revolver was found in defendant McCully's apartment.[16] The testimony of the witness and the police officer relating to the revolver was not rele-

---

[16] The revolver at issue is the .25 caliber revolver found in defendant McCully's apartment on December 2, 1967, pursuant to a lawful search with a warrant.

vant.  Defendant's possession of the revolver, which was unchallenged, is thus tainted with the inference of a prior offense.  The testimony tends to show that the defendant had either committed the theft of the revolver or had received stolen property. Under the setting of this case the introduction of objected-to testimony was erroneous and prejudicial.  *People* v. *Lundberg* (1961), 364 Mich 596; *People* v. *Greenway, supra; People* v. *Matthews* (1969), 17 Mich App 48; *Boggs* v. *State* (1958), 268 Ala 358 (106 So 2d 263).

## VIII.

*Whether the trial court erred in instructing the jury regarding the defendants' exercise of their right not to testify?*

The trial court instructed the jury as follows:

"None of the respondents in this case have taken the witness stand.  Neither were they required to because of this principle of law known as the presumption of innocence.  The burden is upon the prosecutor.  They are not required to take the witness stand.  And the fact, *that fact standing alone,* may not be considered by you as evidence of their guilt.  The fact that they did not take the witness stand does not form a presumption, either of their guilt or of their innocence."  (Emphasis added.)

Defendants argue that the use of the words "that fact standing alone" permits the clear implication that the jury may consider that factor *in conjunction with the proofs* as evidence of defendants' guilt. Having determined that the convictions must be reversed on other grounds, I do not deem it necessary to reach the issue of whether this instruction was erroneous.  I merely reiterate the established principle that a defendant's declination to testify

at his own trial does not create any presumption against the defendant. MCLA § 600.2159 (Stat Ann 1962 Rev § 27A.2159).

A strict standard is to be applied in this area. *People* v. *Mitchell* (1911), 164 Mich 583. Instructions which allow the jury to consider, either by implication or inference, that a defendant's failure to take the stand has any adverse bearing upon his guilt must be avoided. See *People* v. *Nankervis* (1951), 330 Mich 17; *People* v. *Murnane* (1921), 213 Mich 205; *People* v. *Arntson* (1968), 10 Mich App 718.

Other questions raised by defendants are without merit and need not be considered.

For the reasons stated, I would reverse and remand as to all three defendants.